**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jorge SALGADO, Defendant-Appellant.**

No. 85–3209.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1986.

Decided Dec. 5, 1986.

Henry B. Samuels, Denis A. Berkson & Assoc., Ltd., Chicago, Ill., for defendant-appellant.

Pierre Talbert, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

A jury convicted Salgado of federal narcotics offenses, and he was sentenced to 20 years in prison, fined $500,000, and ordered to serve a special parole term for life. His appeal challenges the district court's denial of his motions (1) to disclose the identity of the government's confidential informant and (2) to suppress evidence seized from Salgado's apartment.

1. The charges against Salgado arose out of a transaction in which he sold an ounce of cocaine to a Chicago police officer, Lett, for $1,500. The transaction was arranged by a confidential government informant named Alan, and the sale took place in Alan's home and in his presence. Before trial, Salgado moved the court to order the government to reveal the names of its confidential informants, in particular one who had been a "material witness" to the transaction—who was of course Alan. The government opposed the motion because the informant was involved in other undercover investigations and his safety might be compromised by disclosure of his identity; also he had not been an active participant in the offenses charged and the government didn't intend to call him as a witness. The court denied the motion to disclose. At trial Lett testified that "Al" had introduced him to Salgado and had given Salgado both a knife to cut the foil in which the cocaine was wrapped and a plastic bag in which to place the cocaine sold to Lett. He also testified that Salgado had told him that Al would know where to reach Salgado for larger cocaine purchases. Defense counsel then renewed his motion for disclosure of "Al's" identity, arguing that he needed to interview him in order to determine whether Salgado might have a defense of entrapment. The court granted the motion and ordered that Salgado's counsel be allowed to interview the informant at the office of the U.S. Attorney. This was done the same afternoon, a Friday. Trial was to resume, and did resume, on Monday. When trial resumed, the defense did not call Alan as a witness, or

* Hon. William J. Campbell of the Northern District of Illinois, sitting by designation.

offer any evidence concerning his role in the transaction, or request a continuance to enable a more thorough investigation of Alan's role, although the judge had indicated he would grant a continuance if an adequate investigation could not be conducted before the trial resumed. No doubt, Salgado's counsel lost interest in Alan because his statements at the interview confirmed Lett's version of the transaction, thus scotching the possibility of using Alan to establish a defense of entrapment.

■ In these circumstances it is academic whether the district judge's initial ruling, denying the motion to reveal Alan's identity to the defense, violated the standard of *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), which requires comparing the defendant's need for access to the informant to prepare his defense with the physical danger to the informant, and with the danger of compromising other government investigations, if access is granted. The judge eventually granted the motion, and there is no indication that Salgado was prejudiced by the delay. If defense counsel had needed more time to explore Alan's role in the transaction he could have asked for a continuance—was indeed invited by the judge to do so. But as the interview with Alan produced no suggestion that Salgado might have been entrapped into selling cocaine to officer Lett—an inference anyway highly improbable in light of the extensive evidence that Salgado was selling drugs on a large scale—defense counsel naturally saw no point in pursuing the matter of Alan's participation in the transaction any further. *United States v. Tucker*, 552 F.2d 202 (7th Cir.1977), on which Salgado relies, thus is inapposite.

We reject Salgado's argument that the results of the interview must be disregarded on the ground that Alan was intimidated by being interviewed at the U.S. Attorney's office in the presence of federal agents. He was a government informant, and therefore potentially at risk; it would have been as "intimidating" to be told to go to defense counsel's office for an interview. Salgado argues that Alan should have been interviewed in "neutral surroundings," without specifying where they might be found.

2. The more difficult issue relates to the motion to suppress. When Salgado left Alan's home after selling the ounce of cocaine to officer Lett, federal agents followed him and after a half hour arrested him on the street, searched him, and found several keys, a portable telephone, and a receipt from a lock company. The receipt revealed that the company had, a few days earlier, rekeyed the door lock to an apartment at 2580 West Golf Road in a suburb of Chicago (the sale of cocaine and the arrest had occurred in Chicago), for a customer named "Salgado."

During the negotiations with Lett, Salgado had used his portable telephone to summon an associate, Bernal—who, as a security precaution, was driving around with the cocaine for the deal—to Alan's home to complete the deal. After Bernal arrived, Salgado was called on the portable phone, had a conversation in Spanish, and then told Lett, "You see, I'm a busy man. That was an order for five kilos."

When Bernal left, the agents followed him too, arrested him, and found in his car what appeared to be additional cocaine that Bernal had brought to Alan's residence but had not sold to Lett. Bernal told the agents that the cocaine had come from 2600 West Golf Road, and they went there, and encountered the agents who had arrested Salgado and who had then proceeded with Salgado's keys to 2580. 2580 West Golf Road and 2600 West Golf Road are two apartment buildings, under common management, located about 100 yards apart. The janitor told the agents that Salgado had moved recently to 2580. Bridges, a Chicago police officer who (like Lett) was working with the federal drug agents, used the keys taken from Salgado to open Salgado's apartment. The apartment was unfurnished and there was no one in it. Bridges, accompanied by federal agents, glanced in each room. They

touched nothing and opened no closets or other closed areas. Bridges saw a white plastic box, a balance scale, and a money-counting machine. He and the agents sealed the apartment, then waited in the hallway.

About four hours later another group of agents appeared with a search warrant and made a thorough search. They seized the items that Bridges had seen, plus much else besides, including a large amount of cocaine. The warrant was based on an affidavit by officer Lett describing the circumstances in which Salgado and Bernal had been arrested and establishing that the apartment to be searched was indeed Salgado's and was probably the place where Bernal had gotten the cocaine. The warrant authorized the seizure of cocaine, currency, scales, packaging materials, etc., but did not mention anything that officer Bridges (or the agents accompanying him) had seen. Nor had Lett's affidavit, on the basis of which the warrant was issued, referred to anything that Bridges' group had seen. Another warrant was obtained later and executed but it need not be discussed separately.

Salgado argues that the initial search of the apartment by Bridges and others (but we shall ignore the others to simplify exposition) violated the Fourth Amendment. The government argues that, even if this were so, it would not help Salgado. The only remedy against an unlawful search, in a criminal proceeding, is the suppression of its fruits; and since the evidence used against Salgado was obtained not from the initial search but from the execution of a warrant that had been issued without any reliance on what Bridges had seen, there were no fruits. Bridges' search was immaterial.

The matter is more complicated than this, in two respects. The first and lesser is that the absence of any causal connection between Bridges' search and the issuance of the warrant is not so clear as the government asserts. Granted, neither the warrant itself, nor Lett's affidavit on which the warrant was based, refers to anything Bridges saw. But Lett and his associates might not have sought a warrant had they not known from Bridges' search that executing such a warrant would yield valuable evidence for trial. This assumes of course that whoever participated in the decision to seek the warrant had spoken to Bridges, but that is entirely possible. The government says its *prosecutors* who applied for the warrant didn't know about Bridges' search, and in support it cites to a page in the appendix. The cited page does not support the statement, and in any event the government does not claim that the *drug agents* who advised the prosecutors to seek a search warrant did not know about the search and did not give them information obtained from it, without disclosing the source.

█ Despite this, we think it reasonably plain that the search warrant would have been applied for, issued, and executed even if Bridges had never conducted the allegedly unlawful search. The arrest of Bernal with cocaine—Salgado's cocaine—in his possession, coupled with Bernal's statement that it came from 2600 West Golf Road and the janitor's that Salgado had moved recently from 2600 to 2580, made it more than likely that a search of Salgado's apartment at 2580, which the arresting agents knew Salgado had recently had re-keyed, would turn up contraband or other evidence of Salgado's drug dealings. Thus, information in the agents' possession that owed nothing to Bridges' search abundantly established probable cause for obtaining a warrant—so much so that the agents would have been derelict in their duty had they failed to apply for a warrant based just on what they knew, independently of what Bridges learned and may or may not have told them. Since the warrant would have been obtained and executed even if Bridges had never made his search, Salgado was not hurt by the search, at least in this criminal proceeding. *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), a factually similar case, is controlling on this point.

Our conclusion that the warrant was not "tainted" by the earlier search might seem to end the case, but it merely brings on the second and bigger complication. Salgado argues that even if Bridges' search did not taint the evidence obtained *only* by virtue of the warrant—that is, the evidence that Bridges had never laid eyes on and therefore could not have been thought to have seized before the execution of the warrant—the evidence that Bridges did see was seized in the moment when Bridges saw it (during what Salgado contends is an illegal search) and thus could not have been seized later by the execution of the warrant. And that evidence, he contends, must be suppressed regardless of the sufficiency of Lett's affidavit.

■ The idea that when Bridges saw something he "seized" it, so that when a different group of officers came along later and carted it off pursuant to their search warrant they were not "seizing" it, is semantically intriguing but is unrelated to the policies that animate and limit the exclusionary rule that has been grafted onto the Fourth Amendment. The legal issue is whether the fruits of a search and seizure made pursuant to a valid warrant, amply supported by probable cause obtained without violating anybody's rights, should be excluded from a criminal proceeding because another officer made an illegal search, assuming it *was* illegal. We think the answer is "no." The exclusionary rule is a sanction, and sanctions are supposed to be proportioned to the wrongdoing that they punish. The exclusionary rule punishes the government for obtaining evidence by unconstitutional means. It does this by forbidding the government to use such evidence to convict the person whose constitutional rights it violated. It does not go further and forbid the government to convict him on the basis of lawfully obtained evidence. It thus does not seek to make the person whose rights have been violated better off than he would have been if no violation had occurred. We conclude that the exclusionary rule does not require the exclusion of evidence that would have been obtained lawfully, just in order to punish a

search that did not harm the defendant in any sense relevant to a criminal proceeding, because the search was not a necessary step in obtaining evidence used to convict him. Since the evidence would have been obtained anyway, the alleged violation of Salgado's rights was not a cause, in the legal sense, of his conviction. Maybe Salgado's privacy was invaded, though in rather an ethereal sense, by the fact that Bridges laid eyes on his drug paraphernalia. But for such invasions the only remedy is a tort remedy unless evidence that would not otherwise have been obtained is used in a criminal proceeding against the owner of the paraphernalia.

Salgado argues, however, that the Supreme Court's decision in *Segura* requires the exclusion of the things Bridges saw. Segura was arrested in the lobby of his apartment building. The arresting officers took him to his apartment and entered it without his permission or that of the other occupants, conducted a cursory "glance around" search similar to Bridges' search in this case, and then secured the premises for 19 hours while a search warrant was obtained and executed. The court of appeals held that the initial search was illegal, because there wasn't the kind of emergency ("exigent circumstances," in legalese) that would justify searching a residence without a warrant (or consent); so the items seen during that search had to be suppressed. The government did not seek further review of this part of the court of appeals' decision. The court of appeals also held, however, that the search warrant, not having been based on the initial (and in the court's view unlawful) search, was valid; hence the items seized pursuant to it, other than the items seen in the initial search, were admissible. The only issue considered by the Supreme Court was the admissibility of these other items. Our case involves the admissibility of the items first seen, then seized. Salgado argues that even if the warrant was not tainted by the search, items seen in that search and thereby (he argues) "seized" could not be

"reseized" later, however valid the warrant pursuant to which they were seized.

We disagree that the Supreme Court's decision supports Salgado. The issue of the admissibility of the "seen" items was not before the Supreme Court, those items having been held inadmissible in a part of the court of appeals' decision that the government did not seek further review of. The closest the Supreme Court came to saying that the initial search required exclusion of the items seen in it was in the statement, "As the Court of Appeals held, absent exigent circumstances, the entry may have constituted an illegal *search*, or interference with petitioners' privacy interests, requiring suppression of all evidence observed during the entry." *Id.* at 811, 104 S.Ct. at 3389 (emphasis in original). This passage not only is dictum (i.e., removable without damage to the rest of the opinion), but it appears in a part of the opinion that only two members of the Court joined, see *id.* at 797, 104 S.Ct. at 3382.

■ Thus *Segura* does not answer the question whether illegally seized evidence (if sight is seizure) can ever be cured of its taint by being "reseized" under a lawful warrant—that is, a warrant not dependent on information obtained from the illegal seizure. Suppose one team of officers seizes a piece of evidence illegally for which another team has already obtained, but not yet executed, a lawful search warrant—which is one way to describe the present case. Then even if the initial search and seizure had never taken place the evidence would still have come into the hands of the government lawfully and could have been used in the defendant's trial. There would be no closer causal relationship between the initial search and the introduction of evidence at trial than in a case where the police have two independent sources of information regarding the location of a corpse, one source having been coerced illegally, the other being lawful; evidence of the location, having an independent untainted source, would be admissible. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183,

64 L.Ed. 319 (1920) (Holmes, J.); *Nix v. Williams*, 467 U.S. 431, 441–44, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984) (dictum); *United States v. Palumbo*, 742 F.2d 656, 659–60 (1st Cir.1984). This principle, which underlies our earlier holding that the seizure of the items not seen by Bridges was not tainted by his search, applies equally to the issue whether the search made it impossible for the items he did see to be seized later pursuant to a valid warrant, on the theory that what is seen is seized and cannot be reseized. The considerations are the same. For constitutional violations that do not increase the victim's risk of being convicted of a crime, because they do not produce evidence that would not have been obtained without a violation, the victim's remedy is a tort suit rather than to have his conviction set aside.

■ Our conclusion is that whether there is an interim illegal seizure of evidence is irrelevant to the issue of exclusion, provided there is (as there is here) very great confidence that the evidence would have been obtained for use at trial even if there had not been that seizure. This conclusion agrees with that reached by the other courts of appeals in similar cases. See *United States v. Silvestri*, 787 F.2d 736 (1st Cir.1986), and cases cited there. It is also strongly supported by the Supreme Court's recent endorsement, in the *Nix* case, of the "inevitable discovery" exception to the exclusionary rule, see 467 U.S. at 444–48, 104 S.Ct. at 2509–11, and by the Court's rationale: the police should not be put "in a *worse* position than they would have been in if no unlawful conduct had transpired," *id.* at 445, 104 S.Ct. at 2510 (emphasis in original). Yet that would be the result if because of Bridges' search the government were forbidden to introduce evidence that would have been obtained if that search had never taken place. A contrary result was reached in *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir.1974) (per curiam), but that was before *Nix* was decided.

■ We do not suggest that in cases where a warrant is necessary for a lawful

search, the government can use evidence seized without a warrant if it can show that it would have gotten a warrant if it had asked for one. That would defeat the purpose of requiring a warrant, which is to interpose a neutral judicial officer between the police and its quarry and also (and maybe more important) to require that the grounds for probable cause be set forth before rather than after the search—after is too easy. To excuse getting a warrant on such grounds would be like saying that lynching a man is okay provided you have a well-grounded belief that if tried he would have been convicted and sentenced to death and the sentence carried out. But in this case the government did obtain a warrant. The only question is whether the warrant should be treated as a nullity regarding those items that Bridges had seen (and maybe should not have seen) earlier. We hold that the items that Bridges saw and that later were seized pursuant to a valid warrant were admissible at Salgado's criminal trial even if Bridges can be said to have "seized" them by seeing them in the course of his search.

We therefore need not consider, and do not decide, whether the search Bridges conducted was lawful. On the rather similar facts of *Segura* the Second Circuit, in the part of its decision not reviewed by the Supreme Court, held that the initial search had been illegal. See *United States v. Segura*, 663 F.2d 411, 414–15 (2d Cir.1981). The Second Circuit was unwilling to embrace the proposition that any time you arrest a drug dealer you can enter his home without a search warrant in order to prevent any confederates who may be lurking there from destroying evidence. Courts take a very hard line against the search of a person's home without a warrant (or consent, but that is not a factor here), and therefore demand a genuine showing of emergency before they will excuse the failure of the police to get a warrant. See, e.g., *Welsh v. Wisconsin*, 466 U.S. 740, 748–54, 104 S.Ct. 2091, 2097–2100, 80 L.Ed.2d 732 (1984); *Llaguno v. Mingey*, 763 F.2d 1560, 1564 (7th Cir.1985) (en banc) (plurality opinion). A mere possi-

bility that evidence will be destroyed—a possibility that exists any time a drug dealer is arrested outside of his home or other place of (illicit) business—is not enough. Otherwise the requirement of a warrant would have little meaning in the investigation of drug crimes. A man who lived in New York might be arrested on a trip to Florida, and the police would argue that they could search his home in New York; maybe he had an arrangement with confederates there whereby if he didn't call in at stated intervals they should clear out with all the evidence.

The present case is not quite so stark. The police knew that Salgado had at least one confederate (Bernal), that Salgado's apartment almost certainly was the center of the drug operation and the place where the drugs were stored for distribution, and that Salgado was carrying around a portable telephone, implying that he was in continuous telephonic contact—with Bernal certainly but possibly with someone else as well, someone at the apartment who might become alarmed either if Salgado did not call in or if he did not answer his portable phone when called on it. The person who called Salgado may not have been the customer for the five kilos but an associate of Salgado's, relaying an order received at the apartment. The size of the "order" (assuming Salgado wasn't just puffing) was indicative of a large operation, not a two-man (Salgado and Bernal) operation. Maybe the situation presented an emergency justifying the agents in securing Salgado's apartment while they got a warrant. Some decisions have upheld quick security checks in comparable circumstances. See, e.g., *United States v. Vasquez*, 638 F.2d 507, 531–32 (2d Cir.1980); *United States v. Webster*, 750 F.2d 307, 326–28 (5th Cir. 1984). Others, however, have condemned them, see, e.g., *United States v. Veillette*, 778 F.2d 899, 902–03 (1st Cir.1985); *United States v. Kolodziej*, 706 F.2d 590, 595–97 (5th Cir.1983), and maybe this circuit must be ranged on the side of the condemnors on the strength of *United States v. Gamble*, 473 F.2d 1274, 1277 (7th Cir.1973), and

**610**

*United States v. Cooks,* 493 F.2d 668, 672 (7th Cir.1974). One can argue that the officers in this case should have taken additional steps to find out whether there really was anyone in Salgado's apartment, by asking the janitor or neighbors or simply by listening at the door for signs of activity inside. The counterargument is that judges have no competence to evaluate the minutiae of police practice and the relative effectiveness of alternative tactics for securing potential evidence from destruction.

We need not weigh these arguments in this case. We hold that the items seen by officer Bridges were lawfully seized later pursuant to a valid warrant, even if the initial search was (though we do not decide whether it was) unlawful.

AFFIRMED.