Gary SLOANE, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 85A04–9606–CR–231.

Court of Appeals of Indiana.

Oct. 7, 1997.

Transfer Denied Dec. 9, 1997.

Katharine C. Liell, Wabash, for Appellant–Defendant.

Jeffrey A. Modisett, Attorney General, and Andrew L. Hedges, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE.

Defendant–Appellant Gary Sloane (Sloane) appeals his conviction of Attempted Arson, a Class B Felony.[1]

We affirm the Appellant's conviction.

### ISSUE

The Appellant presents one issue for our review which we restate as:

Whether Sloane received ineffective assistance of counsel when his trial attorney failed to move to suppress and object to the admission of evidence seized at Sloane's residence in a non-consensual, warrantless search?[2]

### FACTS AND PROCEDURAL HISTORY

At approximately 7:17 a.m. on November 28, 1995, the Wabash Fire Department in Wabash, Indiana received an emergency call to a fire at the residence of the Appellant. Officer Blocher of the Wabash City Police arrived first on the scene and observed, through an open garage door, a flame burning in the garage. Within minutes, firefighters and fire apparatus were on the scene and had extinguished both of two separate fires in the garage attached to Appellant's residence. In the garage, the firefighters saw an aerosol can on the garage window sill; rags placed down into and hanging out of the gas tanks of the two automobiles, the motorcycle and the riding lawn mower; a propane gas tank in the back end of the Caballero automobile; a jug of unidentified liquid in the open trunk of the Cadillac automobile; a motor oil receptacle containing some type of liquid on the roof of the Cadillac automobile; a gasoline container near one of the origins;

and plastic gloves near the second of the two origins.

While Master Firefighter Stroup extinguished the fires, other firefighters entered the Sloane residence. Although there were no areas inside the residence where fires had attempted to be set, fire officials found furniture out of place and blocking entrances to the residence; aerosol cans on window sills throughout the residence; bullets and shotgun shells in windows of the residence and facing to the outside; a plastic cup in the kitchen containing still-formed ice cubes; an air tank in one of the fireplaces and the natural gas turned in the "on" position in all the fireplaces; a mixture that appeared to be either gasoline or fuel oil in the sinks and toilets in the residence; broken glass and papers in disarray throughout the living areas of the house; and a Christmas tree knocked over with a liquid thought to be gasoline poured on it.

Upon viewing the condition of the residence, the firefighters present decided to proceed with an investigation, and they then contacted Shift Captain/Fire Investigator Copeland and requested his presence at the scene. The firefighters also discussed with Officer Blocher the situation inside the residence and their belief that this was an incendiary fire, and based upon this information, Officer Blocher then called for detectives from the Wabash Police Department to be present at the scene.

Shift Captain Copeland arrived on the scene at approximately 7:45 a.m. at which time the officer in charge and some of the firemen approached him and informed him of the condition of the interior of the residence. After walking through the residence and examining the situation, Copeland and Master Firefighter Hall obtained samples from the two places of origin in the garage. At approximately 8:20 a.m. Copeland began taking pictures of the residence and its contents. Hall took part in the investigation not only by obtaining samples, but also by making a video tape of the residence. Master Firefighters Siders and Stroup prepared a draw-

---

1. Ind.Code 35–43–1–1.

2. Appellate counsel for Sloane did not represent the defendant at trial.

ing and diagram of the Sloane residence and the items located therein.

Officer Blocher, from the time the fires were extinguished until approximately 10:00 a.m., examined the interior of the residence and documented items found there, as well as taking photographs of the items. After being summoned to the scene by Officer Blocher, Detective Sergeant Whitmer of the Wabash Police Department arrived just prior to 8:00 a.m. He was told of the situation by the firemen and following a walk-through of the Sloane residence, he then proceeded to set up a crime scene, which included dusting for fingerprints and seizing certain items of evidence.

Fred Sumpter, a cause and origin specialist with Herb Norris Associates in Indianapolis, Indiana, was hired by State Farm, the Appellant's insurance company, and the State Farm Special Investigator, Doug Meyer, to investigate the fires at the Sloane residence. On November 30, 1995, Mr. Sumpter and Mr. Meyer entered and examined the Sloane residence, and began taking photographs of the interior of the residence when they were stopped by the Appellant's father. Verbal permission was then given for Mr. Sumpter and Mr. Meyer to be present in the residence, and they again entered the residence and continued their investigation.[3] As part of his investigation, Mr. Sumpter obtained samples from furniture and carpeting in the Sloane residence due to their odor that resembled an odor commonly associated with gasoline, as well as other items of evidence. Later, Mr. Sumpter also received the two origin samples obtained by the Wabash Fire Department on the day of the fire. Mr. Sumpter prepared a Cause and Origin Summary for the insurance company which was based upon this investigation and which was ultimately introduced as evidence at trial together with the photographs taken by him.

Based upon evidence found at the scene of the fires and in Sloane's residence, Sloane was arrested and charged with Attempted Arson as a Class B Felony. Following his jury trial in February, 1996, Sloane was convicted of Attempted Arson and was sen-

tenced to the Indiana Department of Correction for ten years. He then timely filed this direct appeal.

## DISCUSSION AND DECISION

Sloane contends that he was denied effective assistance of counsel based upon his trial counsel's failure to file a motion to suppress evidence obtained by officials in a warrantless search of Sloane's residence, and counsel's further failure to object to the introduction of said evidence at trial.

■■■ Prior to determining whether the Appellant was denied effective assistance of counsel, we must first turn to the constitutionality of the warrantless search of Sloane's residence and attached garage. The Fourth Amendment to the United States Constitution protects both privacy and possessory interests by prohibiting unreasonable searches and seizures. *Culpepper v. State,* 662 N.E.2d 670, 675 (Ind.Ct.App.1996), *reh'g denied, trans. denied* (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), *reh'g denied; Taylor v. State,* 659 N.E.2d 535, 537 (Ind.1995)). Under this Amendment, warrantless searches by the government are *per se* unreasonable. *Clark v. State,* 562 N.E.2d 11, 13–14 (Ind. 1990), *cert. denied,* 502 U.S. 961, 112 S.Ct. 425, 116 L.Ed.2d 445 (1991) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Generally, a judicially issued search warrant is a condition precedent to a lawful search, *Fair v. State,* 627 N.E.2d 427, 430 (Ind.1993), and "[t]he remedy for an illegal warrantless search is the suppression of the evidence obtained from the search." *Clark,* 562 N.E.2d at 14 (citing *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), *reh'g denied,* 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72).

■■■ In dealing with fire-damaged premises, a warrant is required in the absence of consent or exigent circumstances, and the type of warrant required is determined by the object of the search. *Michigan v. Clifford,* 464 U.S. 287, 293–95, 104 S.Ct. 641, 647, 78 L.Ed.2d 477 (1984), *reh'g denied,* 465 U.S.

---

**3.** The record is unclear as to the individual or individuals giving permission for Mr. Sumpter

and Mr. Meyer to investigate the Appellant's residence for the cause and origin of the fire.

1084, 104 S.Ct. 1457, 79 L.Ed.2d 773. An administrative warrant is sufficient if the object of the search is to determine the cause and origin of the fire; however, a criminal warrant is required if the primary object of the search is to gather evidence in a criminal investigation. *Id.*

### A. Search of Sloane's Garage on November 28, 1995

In responding to the emergency call on November 28, 1995, Master Firefighter Stroup arrived in one of the first responding units and saw one garage door open out of which was pouring "very dark black" smoke. (R. 1660). Upon extinguishment of the two fires that existed in Sloane's garage, Master Firefighter Siders noticed a gasoline container near one origin of the fire and at least one pair of rubber gloves at the second origin, both of which were later taken into evidence. (R. 1516, 1535).

After the fires had been extinguished and the two points of origin had been determined, Shift Captain Copeland and Master Firefighter Hall proceeded to obtain samples of the charred material from each of the two points of origin in the Appellant's garage in order to determine the cause of the fires. (R. 1522). Firefighters Copeland and Hall collected these samples soon after the fires were contained and prior to leaving the Sloane residence on November 28, 1995.

Pursuant to the United States Supreme Court's decision in *Clifford* and long-standing case law, an administrative warrant is required when the object of the search is the cause or origin of the fire. 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477. However, prior to its decision in *Clifford*, the Supreme Court addressed firefighters' duties in *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). In order to refrain from framing a firefighter's duties in an unrealistically narrow fashion, the Court stated:

> Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of

continuing dangers such as faulty wiring or a defective furnace. Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished. And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional.

*Tyler*, 436 U.S. at 510, 98 S.Ct. at 1950. Moreover, in the same decision, the Court asserted that clearly firemen are not required to secure a warrant before entering a burning structure to extinguish the blaze, and that once inside, the firemen may seize any evidence of arson that is in **plain view**. *Id.* (*Emphasis added*).

■ The plain view doctrine is a long-recognized exception to the warrant requirements of the Fourth Amendment. The doctrine stands for the premise that objects which are in plain view of an officer who rightfully occupies a particular location can be seized without a warrant and are admissible as evidence. *See Lance v. State*, 425 N.E.2d 77, 78 (Ind.1981); *Coolidge*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564; and *Candler v. State*, 266 Ind. 440, 363 N.E.2d 1233 (1977).

■ In the instant case, the firemen entered Sloane's garage to extinguish the fires in their performance of their duties as firefighters and subsequently seized items of evidence found in the garage in plain view. The firemen also took samples from the two points of origin in the garage in order to have them tested later to determine the cause of the fires. Thus, based upon the Supreme Court's decision in *Tyler*, Sloane's Fourth Amendment rights[4] were not violated by the seizure of the items found in the

---

4. The Appellant having never raised the issue under Article I, Section 11 of the Indiana Consti- tution, we are concerned here only with issues of federal constitutional law.

garage, nor the taking of the samples from the points of origin.

### B. Search of Sloane's Residence on November 28, 1995

While Master Firefighter Stroup extinguished the fires in the garage, other firemen entered the Sloane residence to conduct a search and rescue in an attempt to locate any extension of the fires and/or possible victims of the fires. (R. 1660). It is unclear as to the exact time at which this search and rescue ended and an investigation began, but the record reveals that once the firemen and police officers viewed the condition of the interior of the Sloane residence, they determined an investigation was necessary and proceeded to conduct an arson investigation on the day of the fires, November 28, 1995. (R. 1516, 1661, 1664, 1714, and 1719–1720). The investigation consisted of the taking of photographs of the interior of the Sloane residence; the making of a video tape of the interior of the residence; dusting for fingerprints; and the seizing of evidence from the interior of the residence.

In the determination of whether the entry and seizure of evidence from the Sloane residence violates the Appellant's Fourth Amendment rights, we must look to the factors set out by the Supreme Court in *Clifford*. There, our Supreme Court states that the constitutionality of warrantless and nonconsensual entries onto fire-damaged premises depends upon the analysis of several factors, including: 1. whether there are legitimate privacy interests in the fire-damaged property that are protected by the Fourth Amendment; 2. whether exigent circumstances justify the government intrusion regardless of any reasonable expectations of privacy; and 3. whether the object of the search is to determine the cause of the fire or

to gather evidence of criminal activity. *Clifford*, 464 U.S. at 291–92, 104 S.Ct. at 646.

### 1. Privacy Interests in Fire-Damaged Premises

■ With regard to the first factor of the Supreme Court's analysis, we are again directed by the Court as to the items to be considered in determining the legitimacy of any privacy interests. More specifically, the Court directs that privacy expectations vary with: 1. the type of property; 2. the amount of fire damage; 3. the prior and continued use of the premises; and 4. the owner's efforts to secure it against intruders. *Id.* Essentially, the test is an objective one: "whether 'the expectation [is] one that society is prepared to recognize as reasonable.' " *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). Further, if reasonable privacy interests remain in the fire-damaged property, any official entry requires a warrant unless consent is given or exigent circumstances exist. *Clifford*, 464 U.S. at 291–92, 104 S.Ct. at 646.

#### a. Type of Property

The type of property involved in the instant case is private, residential property.[5] The Supreme Court notes that there exist strong expectations of privacy of an individual's home, and in that vein our court has stated that "[c]ourts should take a very hard line against the search of a person's home without a warrant or consent ..." *Harless v. State*, 577 N.E.2d 245, 248 (Ind.Ct.App.1991) (citing *United States v. Salgado*, 807 F.2d 603, 609 (7th Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988), *reh'g denied*, 487 U.S. 1263, 109 S.Ct. 25, 101 L.Ed.2d 975 (1988)). Not only was this property a private home, but also it contained

---

5. Appellant attempts to make a distinction between the attached garage of the Sloane residence and the house portion of the residence apparently for purposes of distinguishing the Appellant's privacy interests in each. Our Indiana Code defines dwelling as "a building, structure, or other enclosed space, permanent or temporary, movable or fixed, that is a person's home or place of lodging." Ind.Code 35–41–1–10. Our supreme court has expounded upon this defini-

tion such that a garage attached to a house and used for household living or storage purposes has been deemed to be a part of the private dwelling. *See Gaunt v. State*, 457 N.E.2d 211, 213–214 (Ind.1983). In the instant case, we find that the house and the attached garage together constitute the Sloane dwelling. For purposes of this opinion, we have considered the garage and the residence separately based upon the different type of search involved with each.

undamaged personal effects of the owners following the fire.

### b. Amount of Fire Damage

Although the Sloane residence did suffer some damage [6] as a result of the fires, the residence was not reduced to ash and ruins. Instead, the damage to the garage was direct damage from the fire, smoke and heat, but the damage to the residence was indirect heat and smoke damage, as well as soot.

### c. Prior and Continued Use of the Home

The Sloane residence was, prior to the fires, being used as a private residence.

### d. Owner's Efforts to Secure it Against Intruders

In the instant case, Sloane did not have the opportunity to secure his home against intruders because he was taken into custody the afternoon the fires occurred and remained incarcerated for a period of time. Diane Sloane, the estranged wife of the Appellant, did, however, indicate she would secure the house against intruders, but it appears from the record that this was never completed by her. Therefore, this prong of the analysis is not relevant to our decision in this particular case.

Based upon the small amount of fire damage to the interior of the residence; the existence of personal items in the residence at the time of the fires; and the use of the home as a private residence prior to the fires, we conclude that the Appellant did in fact maintain a reasonable privacy interest in the fire-damaged premises. Thus, the warrant requirement applies, and any official entry must be made pursuant to a warrant in the absence of consent or exigent circumstances.

### 2. Exigent Circumstances

The second factor to be considered in the *Clifford* analysis is the existence of exigent circumstances to justify the warrantless intrusion by government officials, in spite of any reasonable privacy interests. Exigent circumstances which justify a warrantless search have been delineated as the "risk of

bodily harm or death, aiding a person in need of assistance, protecting private property, or actual or imminent destruction or removal of evidence before a search warrant may be obtained." *Harless*, 577 N.E.2d at 248 (citing *Sayre v. State*, 471 N.E.2d 708, 714 (Ind. Ct.App.1984), *cert. denied*, 475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986)).

The firemen entered the Sloane residence in order to search for more fires and to rescue any victims inside the house. In doing so, they were attempting to protect the private property of the Appellant from further damage as a result of the fires, and they were attempting to aid any person who was injured or in danger of being injured by a blaze or its effects. There exists strong public policy in favor of protecting the property and lives of fire victims. Therefore, we find that there were exigent circumstances which authorized the officials' warrantless, non-consensual entry into the Sloane residence, regardless of the Appellant's reasonable privacy interests therein.

### 3. The Object of the Search

Although we find that exigent circumstances existed, we are mandated by the Supreme Court to examine the final factor of the analysis which is whether the purpose of the warrantless search is to determine the cause of the fire or to gather evidence of criminal activity. "The object of the search is important even if exigent circumstances exist", and "the scope of the search may be no broader than reasonably necessary to achieve its end. A search to gather evidence of criminal activity **not in plain view** must be made pursuant to a criminal warrant upon a traditional showing of probable cause." *Clifford*, 464 U.S. at 294–95, 104 S.Ct. at 647 (*Emphasis added*).

The object of the search of Sloane's residence, as stated previously, was to search for extension and/or additional fires and to rescue any injured parties. When the fire officials entered the home for that purpose, they were limited to that purpose only. However,

---

**6.** In his brief, Appellant contends his residence was undamaged as a result of the fires. Appellant's Brief at 16–17. However, the record indicates melting of some items in the kitchen area and smoke and heat damage even in the upstairs portion of the home. (R. 1526).

once these officials entered the residence to look for further fires and victims, they saw, *in plain view,* aerosol cans in the windows, shotgun shells in the window sashes, and a glass with still-formed ice cubes in it, among other things. They also smelled gasoline and natural gas fumes.

■ Thus, although Sloane maintained a reasonable privacy interest in his residence after the fires occurred, the exigent circumstances of and strong public policy toward locating and extinguishing any further fires and locating and rescuing any victims, sanctioned the warrantless, non-consensual search of the residence. Moreover, in keeping with the Supreme Court's statements in *Tyler* and the Plain View Doctrine, as set out previously herein, we hold that the items which were within plain view of the officials upon their entry and walk-through of the house in search of other fires or victims, were properly seized. Further, the seizure of these items did not violate the Appellant's Fourth Amendment rights under the United States Constitution.

### C. Search of Sloane's Garage and Residence on November 30, 1995

■ The final search of the Appellant's residence was conducted on November 30, 1995 by Fred Sumpter, a cause and origin specialist. "Searches performed by non-governmental actors are not controlled by the [F]ourth [A]mendment." *Clark,* 562 N.E.2d at 14 (citing *Sizemore v. State,* 483 N.E.2d 56 (Ind.1985)). Moreover, the search of a burned premises conducted by an investigator for the insurance company is not governed by the Fourth Amendment where, though accompanied by representatives of fire and police departments, the insurance company investigator clearly initiated the search. *See Maciejack v. State,* 273 Ind. 408, 404 N.E.2d 7 (1980).

■ Mr. Sumpter was hired to investigate the fires by the insurance company that insured Appellant's residence. Mr. Sumpter was accompanied during his investigation by Mr. Meyer, a special investigator for the Appellant's insurance company. In addition, the record reveals that Shift Captain Cope-

land may have been present at the residence during some portion of Mr. Sumpter's investigation. (R. 1604). However, the record clearly reveals that Mr. Sumpter was conducting an investigation at the Sloane residence at the insistence of and on behalf of the Appellant's insurance company, and that it was his investigation and not that of the fire department. Mr. Sumpter was never hired by the State to do any investigation in this case, and at trial he testified pursuant to subpoena. With no connection to the government officials in this criminal investigation and subsequent criminal case, we find that Mr. Sumpter was in no way a government actor so as to come under the restrictions of the Fourth Amendment for searches and seizures. Therefore, the seizure of evidence by Mr. Sumpter and its admission at trial, particularly the samples of carpet, carpet padding and box springs, do not violate the Appellant's Fourth Amendment Rights because Mr. Sumpter is not a governmental actor who is controlled by the warrant requirements of the Fourth Amendment.

■ The Appellant contends that he was denied effective assistance of counsel when his trial counsel failed to make a motion to suppress and object to the admission of the evidence seized in Sloane's residence in a non-consensual, warrantless search which Sloane contends was in violation of his Fourth Amendment rights. Having determined that the Appellant's Fourth Amendment rights were not violated by the seizure of any of the evidence from the Sloane residence, we must now turn to the Appellant's claim of ineffective assistance of counsel. The standard by which we review counsel's performance is well-settled. To demonstrate his counsel's ineffectiveness, Sloane must satisfy a two-part test. First, he must show that his counsel's performance fell below an objective standard of reasonableness, and that it is reasonably probable that, but for his counsel's deficient performance, the result of the proceedings would have been different. Second, because counsel is presumed to be competent, he must demonstrate these elements by strong and convincing evidence. *Stroud v. State,* 587 N.E.2d 1335, 1338 (Ind.

Ct.App.1992), *trans. denied* (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864).

■ Further, to prevail on a claim that counsel was ineffective for failing to object to the admission of particular evidence, it must be shown that had the objection been made, it would have been sustained by the trial court. *Peete v. State,* 678 N.E.2d 415, 418 (Ind.Ct.App.1997), *trans. denied* (citing *Vega v. State,* 656 N.E.2d 497, 504 (Ind. Ct.App.1995), *reh'g denied, trans. denied* (1996)). Absent such a showing, an appellant cannot prevail on an ineffective assistance of counsel claim. *See Lowery v. State,* 640 N.E.2d 1031 (Ind.1994), *reh'g denied* (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995). "It shall be strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Judicial scrutiny of counsel's performance is highly deferential and should not be exercised through the distortions of hindsight." *Emerson v. State,* 648 N.E.2d 705, 707 (Ind.Ct.App.1995), *trans. denied* (citing *Bellmore v. State,* 602 N.E.2d 111, 123 (Ind. 1992), *reh'g denied* (1993) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864)).

Sloane's counsel discussed in both his opening and closing statements, as well as in cross examination of many of the investigators, the fact that the residence was in shambles and looked as though someone had vandalized it and set it up to be completely ruined by fire. He not only used this evidence to blame someone else (i.e., vandals) for the condition of the home and the fires at the Sloane residence, but also to provide his client with an alibi. In fact, counsel called a local car dealer as a defense witness to testify to Sloane's extreme care and attention he gives to his automobiles. This car dealer also stated that they found sand in the oil fills of the vehicles, which act counsel suggested was performed by these same vandals.

■ Moreover, the Appellant testified at trial that upon entering his home in the early morning hours of November 28, 1995, he heard someone call out "Sloane" and ran in fear to a wooded area near his home. He further testified that he remained there, watching his house, until he apparently fell asleep and awoke to yellow police tape encircling his home. (R. 2108–2114). Thus, it appears that counsel's decision to attempt to use the evidence of the condition of the interior of the residence was a tactical one. We have often noted that a decision by trial counsel to explain, rather than exclude, evidence is a matter of strategy which is within counsel's professional judgment. Generally, we will not second-guess this decision even if it appears that the decision may have been ill-founded. *See Clark v. State,* 597 N.E.2d 4, 10 (Ind.Ct.App.1992), *reh'g denied, trans. denied; Mullins v. State,* 504 N.E.2d 570, 573 (Ind.1987).

■ Therefore, based upon his counsel's strategy as set out above and the deference afforded trial counsel by our courts, we hold that the Appellant has not met his burden to show that his counsel's performance fell below an objective standard of reasonableness. Further, the Appellant has failed to show that the proceedings would have been different but for his counsel's performance, or that counsel's objection would have been sustained by the trial judge. Appellant argues in his brief that there would have been no trial in this case had his counsel filed a motion to suppress the evidence seized at his home. However, we have found that all of the incriminating evidence, including the aerosol cans, the bullets and shotgun shells, and the cup of still-formed ice cubes which contained the Appellant's fingerprints, were seized as evidence pursuant to the Plain View Doctrine. Even evidence of gasoline in the carpet and box springs of Sloane's residence was properly seized and admitted through a non-governmental actor. Moreover, the second prong of the *Strickland* test must fail because, as set out above, the first factor of the test was not proved by strong and convincing evidence.

*CONCLUSION*

Based upon the foregoing, Sloane received effective assistance of counsel because the

evidence in dispute in this appeal was seized pursuant to exigent circumstances and the Plain View Doctrine, as well as by a non-governmental actor. Following this determination, there is no basis for an ineffective assistance of counsel claim against Sloane's trial counsel.

Accordingly, Sloane's conviction is affirmed.

Affirmed.

SHARPNACK, C.J., and CHEZEM, J., concur.