Joshua KENDALL, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0312–CR–1032.

Court of Appeals of Indiana.

April 18, 2005.

Lesa Lux Johnson, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Joshua Kendall appeals his convictions and sentence for dealing in cocaine as a class A felony and resisting law enforcement as a class A misdemeanor. The State cross-appeals the trial court's failure to enter a judgment of conviction on the jury's additional guilty verdict for one count of possession of cocaine and a firearm, a class C felony. We affirm in all respects.

### Issues

Kendall raises the following issues for our review:

I. whether the trial court abused its discretion when it denied his motion for severance of his trial from that of his co-defendant and brother, Thomas Kendall;

II whether the trial court abused its discretion when it denied his *Bat-*

*son* challenge to the State's peremptory strikes of African–American jurors;

III. whether the trial court abused its discretion when it denied .his motion to suppress evidence;

IV. whether the trial court erred when it made an alleged nunc pro tunc entry regarding its ruling on the motion to suppress; and

V. whether his sentence is inappropriate.[1]

The State's sole cross-appeal issue is whether the trial court erred when it vacated Kendall's possession of cocaine and a firearm conviction on double jeopardy grounds.

## Facts

The facts most favorable to the judgment reveal that at around 8:00 p.m. on December 5, 2000, Indianapolis Police Department Officers Jack Tindall and Christopher Lawrence were dispatched to 407 North Hamilton in Indianapolis to investigate an anonymous tip that someone in that house was "cooking drugs." Tr. at p. 272.[2] The residence is a duplex, with 407 North Hamilton on the left side (looking from the front) and 405 North Hamilton on the right. There is a sidewalk that runs from the front porch of 407 North Hamilton, along the north side of the house, to the back door.

After Officers Tindall and Lawrence arrived at the residence, they walked to the front porch. When no one answered Officer Tindall's first knock, he knocked again and said, "Police Department[.]" *Id.* at 278. At that point, Albert Hardister and an unidentified man came to the window and pulled aside a sheet covering it to look outside. Officer Tindall shined his flashlight on his uniform and badge and repeated, "Police Department[.]" *Id.* Hardister and the other man then took off running toward the back of the house.

Believing that the persons inside the house would try to flee out the back door, Officers Tindall and Lawrence ran along the sidewalk on the north side of the home. Officer Lawrence stopped and looked through a window on the north side of the house that was partially covered with newspaper. He saw three African–American males standing together in what appeared to be a kitchen. Meanwhile, Officer Tindall ran to the back of the house, and through an uncovered window near the back door, he observed Hardister pouring what appeared to be cocaine down the drain of the kitchen sink while the water was running. The officer yelled at Hardister to open the door, but Hardister and another person ran toward the front of the house.

Next, both officers proceeded back to the front of the house. By that time, other officers had arrived at the scene and ordered two persons who had crawled out a second-story window, later identified as Thomas Kendall and Kyle Kendall, to kneel down on the roof. Joshua Kendall had also crawled out the window, but he refused to comply with the officers' com-

---

1. Kendall claims that his sentence is "manifestly unreasonable" and cites to Indiana Appellate Rule 17(B). Appellate Rule 17(B) no longer governs appellate review of sentences. Indiana Appellate Rule 7(B) now controls, and it provides: "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds the sentence is inappropriate in light of the nature of the offense and the character of the offender."

2. We remind Kendall's counsel that Indiana Appellate Rule 46(A)(6)(a) requires that each fact statement be supported by citation to the record or Appendix. Kendall's Statement of Facts contains no citations.

mands. He dropped one bag of what was later determined to be cocaine on the ground. He then ran to the edge of the roof and tossed another bag of cocaine. Next, he ran along the roof and jumped to the roof of the neighboring duplex. He then ran back and re-entered the second-story window at 407 North Hamilton.

In the meantime, several officers had received permission from the residents at 405 North Hamilton to enter so that the officers could reach the roof. Once on the roof, the officers entered 407 North Hamilton through the same second-story window and yelled for everyone to come out. Frederick Pace came out of a bedroom, and the police placed him under arrest. The officers found Kendall and Hardister hiding in the attic and arrested them both. During a pat down search, the officers found $1,600 on Kendall.

Subsequently, and pursuant to a search warrant, the officers searched the entire residence and recovered the following: cocaine on a shelf in a bedroom closet; approximately $1,700 in a bathroom cabinet; a surveillance system that included a camera, video monitor, and a warning light that lit when someone pushed the doorbell; a loaded handgun and cocaine packaged for sale in the basement; a shotgun behind the couch in the living room; and a digital scale and cocaine in the kitchen. The officers recovered a total of 319.46 grams of cocaine from the home, including the cocaine Kendall had thrown from the roof.

On December 7, 2000, the State filed an eight-count information which named Kendall, his brother Thomas, Hardister, and Pace as defendants. In particular, the State charged Kendall with dealing in cocaine by possession with intent to deliver, possession of cocaine, possession of cocaine and a firearm, and resisting law enforcement. Before trial, Kendall filed a motion to suppress the evidence the officers had recovered from the home. Following a hearing, the trial court denied his motion.[3] Kendall also filed a motion to sever his trial from that of his co-defendants, Thomas and Hardister, which was also denied.[4] Kendall renewed both motions at trial, and both were again denied.

After the jury was selected, Kendall joined in an oral motion for a new trial based on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Kendall claimed that the State violated the Fourteenth Amendment to the United States Constitution because it peremptorily struck several African–Americans from the jury pool. The trial court denied the motion.

On July 21, 2003, the jury found Kendall guilty as charged. On August 26, 2003, following a sentencing hearing, the trial court identified the following aggravating circumstances: (1) Kendall's criminal history; (2) the particular facts and circumstances of his crimes, including the substantial amount of cocaine, large amounts of money, and the weapons; and (3) at some point during the proceedings, Kendall threatened to kill his brother Thomas. The court identified Kendall's difficult family life as mitigating, but determined that that factor was not given much weight since Kendall had been offered services throughout his life that he had declined to accept. The court sentenced him to forty

---

**3.** The trial court certified its ruling on that motion for purposes of interlocutory appeal, and we accepted jurisdiction. However, Kendall dismissed his appeal and proceeded to trial.

**4.** Pace was not tried with the other three defendants. He testified at trial as a defense witness and explained that he had been convicted of certain crimes prior to Kendall's trial.

years for dealing in cocaine, eight years for possession of cocaine and a firearm, and one year for resisting law enforcement, with all sentences to be served concurrently. The court did not enter judgment on the possession of cocaine charge.

Thereafter, Kendall filed a motion to correct error alleging in part that the trial court had erred when it found as aggravating that Kendall had threatened his brother. The trial court agreed there was insufficient evidence to support that allegation. It also decided not to enter judgment on the possession of cocaine and a firearm charge because of double jeopardy concerns. It then proceeded to impose an identical forty-year aggregate sentence as it had done before. Kendall now appeals.

## Analysis

### I. Severance Motion

■ Kendall first asserts that the trial court abused its discretion when it denied his motion to sever his trial from that of his co-defendants Thomas and Hardister. Specifically, he claims that his defense and his brother Thomas' defense were mutually antagonistic and, therefore, the trial court was required to grant his motion for severance.

■ Several defendants may be joined in a single prosecution. *Lee v. State*, 684 N.E.2d 1143, 1147 (Ind.1997) (citing Ind.Code § 35–34–1–9). However, upon a motion by a defendant, the trial court may order a separate trial "whenever the court determines that a separate trial is necessary to protect a defendant's right to a speedy trial or is appropriate to promote a fair determination of the guilt or innocence of a defendant." *Id.* (quoting Ind.Code § 35–34–1–11(b)). The trial court has discretion to grant or deny a motion for separate trials. *Id.* However, a trial court must grant severance of trials where there are mutually antagonistic defenses and the acceptance of one defense would preclude the acquittal of the other. *Id.* Upon review, the trial court's decision is measured by what actually occurred at trial rather than what is alleged in the motion. *Id.*

Kendall moved for a separate trial because he claimed that his brother would testify that he was visiting Kendall at his house on the night in question and that he had no knowledge of the contraband found inside the house. Thomas did, in fact, testify to that effect. Thus, Thomas' defense that he was merely visiting the home and that Kendall lived there did implicate Kendall.

However, "the mere fact that one defendant implicates another does not entitle the latter to a separate trial," and "there is not a constitutional right to be protected from damaging evidence." *Id.* "Such protection would result in separate trials as a matter of right for all cases with more than one defendant." *Id.* We conclude that the trial court did not abuse its discretion when it denied Kendall's motion for a separate trial because Kendall was merely implicated by his co-defendant's defense.[5]

■ Further, even if this were a case of mutually antagonistic defenses, Kendall must show actual prejudice resulting from the trial court's failure to grant the severance motion. *See id.* at 1148 (citing *Castro v. State*, 580 N.E.2d 232, 234 (Ind.1991)). Kendall cannot show prejudice here because Thomas would have been permitted to testify in a separate trial that he was visiting Kendall at 407 North Hamilton. *See id.* (evaluating whether defendant was

5. Kendall has failed to explain how Thomas' defense is antagonistic to *his* defense. In fact, he does not articulate his defense theory in his brief or adequately explain how acceptance of Thomas' testimony would necessarily preclude his own acquittal.

prejudiced by denial of motion for separate trial and stating defendant had not pointed to any specific testimony or evidence that could not have been admitted had defendant been tried separately). In *Lee,* 684 N.E.2d at 1148–49, our supreme court quoted the following language from *Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993):

> While an important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence, ... a fair trial does not include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant.

(Emphasis, quotations, and citations omitted). Thus, Kendall cannot demonstrate that he was actually prejudiced by the trial court's denial of his motion for severance.

## II. Batson Challenge

 Next, Kendall claims that the trial court erred when it denied his *Batson* challenge. The exercise of racially discriminatory peremptory challenges is constitutionally impermissible. *Wright v. State,* 690 N.E.2d 1098, 1104 (Ind.1997) (citing *Batson,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). To raise a prima facie constitutional claim, a defendant must establish that: (1) the juror is a member of a cognizable racial group; (2) the prosecutor has exercised peremptory challenges to remove that group's members from the jury; and (3) the facts and circumstances of the case raise an inference that the exclusion was based on race. *Id.* Once a defendant makes the requisite prima facie showing, the burden shifts to the prosecutor to provide a race-neutral explanation

for the peremptory strike. *Wright,* 690 N.E.2d at 1104. Then the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* The trial court's decision on the ultimate question of discriminatory intent represents a finding of fact that is accorded great deference on appeal because the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. *Id.*

Here, after the parties had completed their peremptory challenges, counsel for one of Kendall's co-defendants made a *Batson* challenge, and Kendall's counsel joined in the motion. The basis of that challenge was that the State had used five of its six peremptory challenges to strike African–American jurors. The trial judge denied the challenge without requiring the State to provide a race-neutral explanation for its challenges, noting that the State had left two African–Americans in the jury pool, one of whom was struck by defense counsel and one who was impaneled.

 Kendall asserts that the trial court abused its discretion when it concluded that the defendants did not make a prima facie showing of purposeful discrimination. We disagree. The removal of some African–American jurors by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination. *Kent v. State,* 675 N.E.2d 332, 340 (Ind.1996). This case is similar to others in which it has been held there was no prima facie showing of racial discrimination. *See Phillips v. State,* 496 N.E.2d 87, 89 (Ind.1986) (holding State's use of peremptory challenges to remove three of four African–Americans from jury venire did not raise inference of discrimination where remaining African–American was seated on the jury). We cannot say the trial court abused its discretion in conclud-

ing Kendall did not establish a prima facie case where the State left two African–Americans in the pool, one of whom was struck by one of the defendants and one of whom was seated on the jury. Kendall has not shown that the trial court erred when it denied his *Batson* challenge.

### III. Motion to Suppress

■ Kendall claims in his next argument that the trial court erred in denying his motion to suppress the evidence recovered from 407 North Hamilton. However, as noted Kendall did not pursue an interlocutory appeal from the original denial of his motion and instead proceeded to trial, during which an objection to the evidence was renewed. Thus, the issue is actually whether the trial court abused its discretion by admitting the evidence at trial. *Packer v. State*, 800 N.E.2d 574, 578 (Ind. Ct.App.2003), *trans. denied*. A trial court has broad discretion in ruling on the admissibility of evidence and we will reverse such a ruling only for an abuse of that discretion. *Id.* "An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court." *Id.*

■ Although Kendall appears to challenge primarily the admission of evidence recovered under the search warrant, his argument is focused on the warrantless activity by the police that preceded the search warrant's issuance; he does not challenge the warrant itself per se. The Fourth Amendment to the United States Constitution's protection against unreasonable searches and seizures generally is protected by the requirement that a warrant be issued by a neutral judicial officer prior to a search being conducted.[6] *Black v. State*, 810 N.E.2d 713, 715 (Ind.2004). "There are, however, exceptions to the warrant requirement." *Id.* If a search is conducted without a warrant, the burden is upon the State to prove that, at the time of the search, an exception to the warrant requirement existed. *Id.* One such exception to the warrant requirement is when exigent circumstances exist. *Smock v. State*, 766 N.E.2d 401, 404 (Ind.Ct.App. 2002). Exigent circumstances include an objective and reasonable fear on the part of police officers that evanescent evidence is in immediate danger of destruction by people within the premises. *See Esquerdo v. State*, 640 N.E.2d 1023, 1027 (Ind.1994).

■ The first and central issue we address is whether it was permissible for Officer Tindall to peer through the window of 407 North Hamilton and, therefore, to view Hardister apparently attempting to dispose of cocaine down the kitchen sink.[7] The question essentially is whether Officer Tindall made a proper "open view" observation into the house. The concept of

---

**6.** Kendall also asserts that the search violated Article 1, Section 11 of the Indiana Constitution. In support of this assertion, his only citation of authority pertinent to his arguments is *State v. Hanley*, 802 N.E.2d 956 (Ind.Ct.App.2004), *trans. denied*. The sole holding of that case was that the State, appealing from the grant of a motion to suppress, failed to make any argument that the challenged search was permissible under the Indiana Constitution and, therefore, we affirmed the trial court's ruling on the basis of waiver by the State. *See id.* at 958–59. The case lends no support to Kendall's claims. To the extent that Kendall merely mentions Arti-

cle 1, Section 11 in other aspects of his argument, those claims are waived. *See Abel v. State*, 773 N.E.2d 276, 278 n. 1 (Ind.2002) (concluding state constitutional claim waived where defendant presented no authority or independent analysis supporting separate standard under state constitution).

**7.** We need not address the propriety of Officer Lawrence's view through a window on the side of the residence because what he observed was identical to what Officer Tindall observed.

"open view" is used in situations in which a law enforcement officer observes something from an area that is not constitutionally protected, but rather is in a place where the officer is lawfully entitled to be. *Justice v. State*, 765 N.E.2d 161, 165 (Ind. Ct.App.2002). "In such situations, anything that is within 'open view' may be observed without having to obtain a search warrant because making such 'open view' observations do not constitute a search in the constitutional sense."[8] *Id.*

 Fourth Amendment protection is extended to a home's curtilage, which is defined "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). Additionally, the curtilage is not protected from all police intrusion. Police may enter onto the curtilage to conduct legitimate police business, such as investigating an anonymous tip. *Divello v. State*, 782 N.E.2d 433, 437–38 (Ind.Ct.App.2003), *trans. denied.* In doing so, however, police must utilize normal means of access to and egress from the house and stay within recognized means of access to the house that are reasonable under the circumstances. *Id.* Professor LaFave has summarized as follows:

Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment. But other portions of the lands adjoining the residence are protected, and thus if the police go upon these other portions and make observations there, this amounts to a Fourth Amendment search, and this is so even if these other portions are themselves clearly visible from outside the curtilage.

1 Wayne R. LaFave, *Search and Seizure* 2.3(f) (3d. ed.1996) (footnotes omitted).

This court also stated in *Divello:*

The circumstances determining which portions of property may reasonably be viewed as open to visitors are determined on a case-by-case basis and will necessarily include consideration of the features of the property itself, such as the existence of walkways and fences or other obstructions to access or viewing, the location of primary residential entryways, as well as the nature or purpose for the visitor's call. Common experience teaches that under normal circumstances, uninvited visitors coming to a residence to speak with an owner or resident are expected to come to the residence's most direct, obvious and prominent entryway, which in most cases is its front door.

Under most circumstances, uninvited visitors are also expected to leave by the same route after knocking on the front door and receiving no response. Of course, the nature of the circumstances surrounding the visit can also affect the scope of the property open by implication. For example, persons previously invited to access a residence by alternate entryways, or those coming on truly pressing or emergency matters could reasonably be expected to seek out residents through areas other than the front door.

---

**8.** The "plain view" doctrine differs from "open view" in that "plain view" only applies to contraband seen after an officer has properly entered a constitutionally protected area. *Haley v. State*, 696 N.E.2d 98, 102 (Ind.Ct. App.1998), *trans. denied.*

782 N.E.2d at 438. The Oregon Court of Appeals also made the following observation, after stating that police officers conducting an investigation generally have no more right to enter upon a citizen's property than any other stranger:

> Going to the front door and knocking [is] not a trespass.... Doing so is common in this society that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion. Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society.... We do not place things of a private nature on our front porches that we may very well entrust to the seclusion of a backyard, patio or deck.

*State v. Somfleth,* 168 Or.App. 414, 422, 8 P.3d 221, 225 (2000) (quoting *State v. Ohling,* 70 Or.App. 249, 252–53, 688 P.2d 1384, 1386 (1984), *rev. denied*) (internal quotations omitted); *cf. also California v. Ciraolo,* 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986) (stating "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home *on public thoroughfares*") (emphasis added). It is reasonable to conclude that persons living in a house with a publicly accessible front door and a back door not connected to the front of the house by any recognizable pathway would be highly surprised and quite possibly angered if a delivery person or solicitor approached their back door looking for them after they declined to answer the front door. Depending on the circumstances, a person might even reasonably feel alarmed or frightened if an uninvited stranger came knocking on their back door after the person refused to answer the front door.

However, going to the back door of a house is not automatically improper. As this court held in *Divello,* "[w]hen there are open and obvious clues that a door other than the front door is to be used as a direct and primary entryway, then that door may also be approached by uninvited visitors." 782 N.E.2d at 438. In that case, because a sidewalk led from the defendant's driveway to a porch adjoining the back door, and the defendant also acknowledged that it was normal for visitors to come to either the front or back door, this court concluded that officers had properly approached the back door rather than the front door. *Id.*

Here, after Officers Tindall and Lawrence knocked on the front door of 407 North Hamilton and identified themselves as police officers, in response to an anonymous tip regarding drug manufacturing at the residence, they heard the occupants running inside the house. Thus, in this case the occupants of the house did more than merely refuse to answer the door. Their conduct in running to the back of the house, combined with the anonymous tip, did not mean that the officers' "legitimate police business" was finished and that they had to leave the premises immediately after the occupants failed to answer the door. Instead, they were entitled to pursue their investigation using constitutional methods.

In so doing, Officer Tindall followed a sidewalk that led directly to the rear patio of the residence. There was no gate or obstruction blocking access to the backyard. Officer Tindall then stepped slightly off of the patio in order to look through the uncovered kitchen window. This de minimis straying "off the beaten path" does not render Officer Tindall's conduct unconstitutional or unreasonable. Instead, he remained primarily on a recognizable

means of access to the rear of the property that was reasonable under the circumstances. This case is unlike that part of *Divello* in which this court held it was improper for officers to cross through a private backyard and a privacy gate in order to access another property. 782 N.E.2d at 438–39. Additionally, Officer Tindall testified that there was no covering on the kitchen window that he looked through. Thus, his observation of Hardister disposing of what appeared to be cocaine down the kitchen sink was constitutional. *See Sayre v. State*, 471 N.E.2d 708, 713 (Ind.Ct.App.1984) (holding police officer properly viewed drug paraphernalia through window with open curtain where "[t]here was no substantial or unreasonable departure from the access route to the front door nor was a particularly intrusive method of viewing used."), *trans. denied* (1985), *cert. denied*, 475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986).

 Having responded to an anonymous tip of alleged drug manufacturing at the residence, having heard the occupants run through the house after seeing Officers Lawrence and Tindall, and then having permissibly observed Hardister dumping what appeared to be cocaine down a sink, police officers possessed probable cause that the residence did in fact contain contraband. Furthermore, exigent circumstances clearly existed with respect to the imminent destruction of evidence, thus justifying an immediate warrantless entry into the house to prevent that destruction without having to wait for a search warrant.

 Kendall cites *State v. Williams*, 615 N.E.2d 487 (Ind.Ct.App. 1993), for the proposition that the police officers "created" the exigent circumstances here. We find *Williams* to be readily distinguishable. There, a police officer already had probable cause to believe there were drugs in a residence before he knocked on the door and it thus was clearly foreseeable that the occupant would attempt to destroy contraband when the officer knocked and identified himself. *Id.* at 488–89. We held the officer's subsequent entry into the residence after observing the occupant run through the house was unconstitutional and noted that there was no explanation as to why a search warrant had not been obtained before approaching the residence. *Id.* Here, by contrast, the police officers did not have probable cause that 407 North Hamilton contained drugs, only an anonymous tip to that effect. They could not have obtained a search warrant before knocking on the door and the occupants' response to the officers' appearance was not clearly foreseeable, unlike in *Williams*, but only served to partially corroborate a tip regarding illegal activity at the residence. In sum, the trial court did not abuse its discretion in admitting the evidence recovered during the search of 407 North Hamilton.[9]

### IV. Purported Nunc Pro Tunc Entry

 Kendall next argues that the trial court improperly modified its pretrial ruling on the motion to suppress when, during trial, it changed the wording of the order to reflect that Kendall, not Pace, was the individual who jumped out of the sec-

---

9. We are cognizant that another panel of this court, in considering the appeal of Hardister, Kendall's co-defendant, has held that the trial court erroneously denied the motion to suppress and, therefore, reversed Hardister's convictions. *Hardister v. State*, 821 N.E.2d 912 (Ind.Ct.App. 2005). The left hand is aware of what the right hand is doing here. The parties never moved to consolidate their appeals, however, and two judges of this panel find themselves unable to agree with the result reached by Hardister's panel.

ond-story window, threw the bags of cocaine, and leaped onto the roof of the adjoining half of the duplex. The trial court made the alteration after it stated that the original order did not accurately reflect the court's own notes taken at the suppression hearing. Kendall asserts that res judicata precluded the State from arguing at trial that Kendall was that individual because the trial court's original order identified that person as Pace and the trial court could not change the original order.

Both parties focus their attention on whether the trial court's alteration of the wording in the motion to suppress order was an improper nunc pro tunc entry or a permissible correction of a clerical error under Indiana Trial Rule 60(A). We deem it unnecessary to resolve this dispute. This is because it is axiomatic that a trial court has the inherent power to reconsider, vacate, or modify any previous order so long as the case has not proceeded to final judgment. *Stephens v. Irvin*, 730 N.E.2d 1271, 1277 (Ind.Ct.App.2000), *trans. denied*. It is also well-settled that a pretrial ruling on a motion to suppress is not a final judgment for res judicata purposes and that such a ruling may be modified by the court that issued the ruling or another court being asked to reconsider the ruling. *See Joyner v. State*, 678 N.E.2d 386, 393 (Ind.1997); *see also Gasaway v. State*, 249 Ind. 241, 243, 231 N.E.2d 513, 514 (1967) (holding that pretrial ruling on motion to suppress was "in no sense a final judgment" for res judicata purposes). Here, the trial court did not even change the result of its previous ruling, but only the wording of the order and some of the facts noted therein that were irrelevant to the suppression determination. The trial court was entirely free to amend its order at any time before final judgment was entered. There is no error on this issue.

## V. Sentence

Kendall's final contention is that his forty-year sentence is inappropriate under Indiana Appellate Rule 7(B). Under Article 7, Section 6 of the Indiana Constitution, we have the constitutional authority to review and revise sentences. *Foster v. State*, 795 N.E.2d 1078, 1092 (Ind.Ct.App.2003), *trans. denied*. However, we exercise with great restraint our responsibility to review and revise sentences, recognizing the special expertise of the trial bench in making sentencing decisions. *Id.* A sentence that is authorized by statute will not be revised unless it is inappropriate in light of the nature of the offense and the character of the offender. *Id.* (citing Ind. Appellate Rule 7(B)).

Kendall claims that this court should "remand for re-sentencing for the minimum sentence" because he was only nineteen when he committed the crimes and has a relatively minor criminal history. In support of his argument that his sentence is inappropriate, Kendall relies on *Evans v. State*, 725 N.E.2d 850 (Ind.2000), and *Love v. State*, 741 N.E.2d 789 (Ind.Ct.App. 2001). Those cases are distinguishable in part because they involve nineteen-year-old defendants who were sentenced to the maximum term of fifty years for class A felony drug convictions. Here, the trial court imposed an enhanced, but not maximum, sentence of forty years.

Further, as the trial court noted at sentencing, the nature of Kendall's offense weighs in favor of an enhanced sentence. The officers discovered over 300 grams of cocaine in and around the home, and it was clear that the home was being used as a crack house. In addition, Kendall's criminal history shows that, despite repeated contacts with the criminal justice system, he has continued along a path of criminal behavior. He has three true findings as a

juvenile. Therefore, we conclude that Kendall's forty-year sentence is appropriate in light of the nature of his offenses and his character.[10]

### VI. Double Jeopardy Cross–Appeal

■ The State cross-appeals and asserts that the trial court erred when it sua sponte vacated Kendall's conviction for possession of cocaine and a firearm on double jeopardy grounds. The State argues that Kendall's convictions for class A felony dealing in cocaine and class C felony possession of cocaine and a firearm violate neither the statutory elements test nor the actual evidence test under the Double Jeopardy Clause of the Indiana Constitution. We conclude, however, that it is unnecessary to determine whether these dual convictions run afoul of the Indiana Constitution. This is because we must follow a series of rules of statutory construction and common law that are separate and in addition to the protections afforded by the Indiana Double Jeopardy Clause. *Spivey v. State*, 761 N.E.2d 831, 834 (Ind.2002). One of these rules prohibits " '[c]onviction and punishment for a crime which is a lesser-included offense of another crime for which the defendant has been convicted and punished.' " *Guyton v. State*, 771 N.E.2d 1141, 1143 (Ind.2002) (quoting *Richardson v. State*, 717 N.E.2d 32, 56 (Ind.1999) (Sullivan, J., concurring)). In our view, the conviction for class C felony possession of cocaine necessarily is an included offense of class A felony dealing in cocaine based on Kendall's possession of cocaine with intent to deal. There are numerous cases from our court and our supreme court that support that proposition.

Indiana Code Section 35–38–1–6 provides that if a defendant is charged with an offense and an included offense in separate counts and is found guilty of both counts, "judgment and sentence may not be entered against the defendant for the included offense." Indiana Code Section 35–41–1–16 states:

'Included offense' means an offense that:

(1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;

(2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or

(3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

"If the evidence indicates that one crime is independent of another crime, it is not an included offense." *Iddings v. State*, 772 N.E.2d 1006, 1017 (Ind.Ct.App.2002), *trans. denied.*

It has been held repeatedly that possession of cocaine is a lesser-included offense of possession of cocaine with intent to deliver. *See, e.g., Molino v. State*, 546 N.E.2d 1216, 1219 (Ind.1989); *Davenport v. State*, 734 N.E.2d 622, 624 (Ind.Ct.App. 2000), *trans. denied.* Most recently, we held that it violated double jeopardy to convict a defendant of both possession of cocaine with intent to deliver as a class A felony and possession of cocaine within 1000 feet of a school as a class A felony, where possession of the same cocaine at the same time supported both charges. *Jones v. State*, 807 N.E.2d 58, 67 (Ind.Ct. App.2004), *trans. denied.* The State, in

---

**10.** Kendall has not challenged the constitutionality of his sentence under the Sixth Amendment and its application to sentencing as described in *Blakely v. Washington*, 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

fact, conceded in that case that the dual convictions violated double jeopardy.[11]

In this case, the State specifically charged Kendall with dealing in cocaine by possessing the drug with intent to deliver it. *See* Ind.Code § 35–48–4–1(a)(1)(C). The State also alleged that Kendall knowingly possessed cocaine and was also in possession of a firearm, namely, a handgun and a shotgun. *See* I.C. § 35–48–4–6(b)(1)(B). The amount of cocaine, plus the other evidence adduced, convincingly leads to the conclusion that there was dealing afoot here. However, the same possession of cocaine used to support the A felony dealing charge was also used to support the C felony possession of a cocaine and firearm charge. The State posits that there is no double jeopardy problem in this case because Kendall's possession of a firearm was only necessary to support the C felony conviction, but was not needed to support the A felony conviction. Although that is technically accurate, we cannot agree that it is proper to allow the C felony conviction to stand.

Pursuant to binding supreme court authority as announced in *Molino*, it is indisputable that Kendall could not have been convicted of the "base" offense of class D felony possession of cocaine in addition to a class A felony conviction for possession of cocaine with intent to deliver. It would be illogical to hold that such a conviction could not have stood, but the "enhanced" class C felony offense based on Kendall's possession of a firearm is permissible. We also observe that in *Jones*, the fact that the defendant possessed cocaine within 1000 feet of a school was necessary to convict him of class A felony cocaine possession, but was not necessary to convict

him of class A felony dealing in cocaine because more than three grams of the drug were involved. *Compare* I.C. § 35–48–4–1(b)(1) *with* I.C. § 35–48–4–6(b)(3). However, we still directed that the cocaine possession conviction be vacated.

We conclude that the correct way to approach this case is that the enhancement of a cocaine possession charge because of simultaneous possession of a gun or proximity to a school or park is irrelevant to the lesser-included offense analysis—there is only one base offense of possession of cocaine with multiple possible penalty enhancements, not multiple possible offenses of possession of cocaine within 1000 feet of a school, simultaneous possession of cocaine and a gun, and so forth. First, we observe that although a defendant must knowingly or intentionally possess cocaine in order to be convicted of possession of cocaine under Indiana Code Section 35–48–4–6(a), there is no mens rea assigned to enhancing factors under subsection (b) such as possession of a firearm, the quantity of the drug, or proximity to a school or park. *See Walker v. State*, 668 N.E.2d 243, 244–45 (Ind.1996) (holding that dealing in cocaine statute requires no mens rea or scienter with respect to whether cocaine was possessed within 1000 feet of a school).

Second, in *Thomas v. State*, 684 N.E.2d 222, 223 (Ind.Ct.App.1997), this court characterized carrying a handgun without a license, enhanced to a class C felony because the defendant had a prior felony conviction, as "a separate and distinct crime" from "unenhanced" A misdemeanor carrying a handgun without a license. Our supreme court rejected this conclusion in *Ross v. State*, 729 N.E.2d

11. Although we are not deciding this case strictly on double jeopardy grounds, *Jones* is still informative as to the extent it is well settled that dual convictions for possession of cocaine and possession of the same cocaine with intent to deliver cannot both stand.

113, 117 n. 17 (Ind.2000). Also relevant is *Belser v. State,* 727 N.E.2d 457 (Ind.Ct. App.2000), *trans. denied.* There, we held that double jeopardy principles precluded the defendant's convictions for two counts of arson based on the intentional setting of one fire, where one count alleged arson resulting in damage to a dwelling and the other count alleged arson under circumstances that endangered human life. *Id.* at 462. We noted "that the charges we examine today are merely enhanced charges of the base offense of arson" and that allowing multiple convictions based on different enhancing factors was a "hybrid" violation "of the double jeopardy violations Justice Sullivan discusses in his concurring opinion in *Richardson.*" *Id. Belser* and *Ross* and the language of the cocaine possession statute itself instruct us that, like the carrying a handgun without a license and arson statutes, we should regard possession of cocaine under Indiana Code Section 35–48–4–6 (that is, possession without intent to deliver) as one crime under all circumstances that is not made a different, separate, or distinct crime by whatever enhancing circumstances might exist. As such, possession of cocaine under Section 35–48–4–6 is a lesser-included offense of possession of cocaine with intent to deliver under Section 35–48–4–1(a)(2).

We also note the holding in *Davis v. State,* 770 N.E.2d 319 (Ind.2002). There, our supreme court held that where "a single act [i.e. one that results in serious bodily injury] forms the basis of both a class A felony burglary conviction and also

the act element of an attempted murder conviction, the two cannot stand." *Id.* at 324. This was so as a matter of statutory construction and common law, even though the convictions for both attempted murder and class A felony burglary did not violate the *Richardson/Spivey* "actual evidence" test because the burglary conviction required proof of elements not required for the attempted murder conviction. *Id.* As a remedy, our supreme court directed that the burglary conviction be reduced to a class B felony, because that level of burglary does not require proof of bodily injury.

In the case before us, a single act— possession of cocaine—forms the basis of both the class A felony dealing conviction and class C felony "simple" possession conviction. Here, unlike in *Davis,* we cannot remedy the problem of using this single act twice by reducing the seriousness of the class C felony possession conviction; if we disregard the single act of cocaine possession, there simply is no "lesser" crime of which Kendall could be convicted in addition to class A felony possession of cocaine with intent to deliver. In sum, we cannot say that Kendall's possession of cocaine and a firearm is independent of his possession of the very same cocaine with intent to deliver and, therefore, it is a lesser included offense. We conclude the trial court properly vacated Kendall's class C felony possession of cocaine conviction.[12]

### Conclusion

The trial court did not abuse its discretion in denying Kendall's motion for sever-

---

12. In *Whitt v. State,* 659 N.E.2d 512, 513–14 (Ind.1995), our supreme court held that the defendant's two convictions for possession of cocaine within 1000 feet of school property and possession of cocaine without having paid the Controlled Substances Excise Tax did not violate double jeopardy. We note, however, that the opinion analyzed the issue solely as whether the two convictions violated the "same elements" federal constitution dou-

ble jeopardy test under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). As noted, we have not relied here upon a constitutional double jeopardy analysis, but upon separate and well-settled principles of statutory construction and common law in concluding that Kendall's C felony possession of cocaine conviction cannot stand.

ance and his challenge to the State's use of peremptory strikes, and in admitting evidence recovered during the search of 407 North Hamilton. The trial court also did not err in modifying the findings of its pretrial motion to suppress ruling during trial. We find Kendall's sentence to be appropriate. Finally, we reject the State's argument that the trial court erred in refusing to enter a judgment of conviction for possession of cocaine and a firearm in addition to a judgment of conviction for dealing in cocaine by possession of cocaine with intent to deliver. We affirm.

Affirmed.

SULLIVAN, J., concurs.

NAJAM, J., concurs in part and dissents in part, with opinion.

NAJAM, Judge, concurring in part and dissenting in part.

I fully concur with the majority on Issues I, II, IV, and V, but respectfully dissent from the majority's determinations on Issue III and the State's cross-appeal. Consistent with the panel in *Hardister v. State*, 821 N.E.2d 912 (Ind.Ct.App.2005), I would hold that the officers in this case violated the Fourth Amendment when, after the occupants exercised their right not to answer the front door, the officers ran to the back door of the residence in pursuit of those inside. Further, the trial court erred when it sua sponte vacated Kendall's possession of cocaine and a firearm conviction because possession of cocaine and a firearm is not a lesser-included offense of possession with intent to deliver.

**Motion to Suppress**

The unlawful manufacture, possession, dealing, and use of controlled substances is a scourge upon our society, devastating the lives of individuals and families alike, and placing an enormous burden on law enforcement and the criminal justice system. Recently, the impact of methamphetamine has been especially pernicious. But the epidemic of unlawful drugs also sometimes threatens the Fourth Amendment. This is such a case.

As the United States Supreme Court has recognized, the Fourth Amendment embodies the centuries-old principal of respect for the privacy of the home. *See Wilson v. Layne*, 526 U.S. 603, 609–10, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Thus, the warrantless search of a person's house carries with it the greatest risk for violation of a person's constitutional right to privacy. In this context, we must be especially vigilant that judicial hairsplitting does not chip away at the constitution. As we said in *Harless v. State*, 577 N.E.2d 245, 248 (Ind.Ct.App.1991), "Courts should take a very hard line against the search of a person's home without a warrant or consent; and, therefore, [courts should] demand a genuine showing of an emergency before they will excuse the police's failure to obtain a warrant." (Citing *United States v. Salgado*, 807 F.2d 603, 609 (7th Cir.1986) *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988)).

In this case, as the officers stood on the front porch of 407 North Hamilton, the occupants signaled that they did not want to answer the door. The occupants had no legal duty to answer the door. At that point, there was no contraband in plain view, and there were no exigent circumstances. The officers did not have probable cause to obtain a warrant. Rather, all they had was an uncorroborated anonymous tip.

An uncorroborated anonymous tip has no constitutional significance and is not a license to search the premises. An anonymous tip, by itself, cannot provide the basis for probable cause. *See Illinois v. Gates*, 462 U.S. 213, 268, 103 S.Ct. 2317, 76

L.Ed.2d 527 (1983). In *Hardister*, we concluded that neither the occupants' refusal to answer the door, nor the occupants' movements inside home, provided probable cause to search this residence. 821 N.E.2d at 920. Based on no more than an uncorroborated anonymous tip, the officers in this case undertook a warrantless search that was unreasonable as a matter of law.

In the end, the officers hit the jackpot, which would be laudable, except that a post hoc justification cannot overcome a Fourth Amendment violation. *See, e.g., Jaggers v. State*, 687 N.E.2d 180, 185–86 (Ind.1997) (rejecting argument that good faith exception applied to unlawfully issued warrant based solely on uncorroborated hearsay and stating reasonable police officer should know that *corroboration of anonymous tip is necessary to obtain a warrant*). Kendall had a reasonable expectation of privacy in the curtilage surrounding his home. The officers' search of the premises, which occurred following a lawful refusal to answer the door, and was based on no more than an uncorroborated anonymous tip, was per se unreasonable under the Fourth Amendment.

As this court explained in *Hayes v. State*, 794 N.E.2d 492, 495 (Ind.Ct.App. 2003), *trans. denied:*

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *State v.*

*Straub*, 749 N.E.2d 593, 597 (Ind.Ct. App.2001) (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). A principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter a residence for purposes of search or arrest. *Id.* Thus, searches and seizures inside a home without a warrant are presumptively unreasonable. *Id.* But there are a "'few ... and carefully delineated'" exceptions to the warrant requirement. *Id.* (quoting *United States District Court*, 407 U.S. at 318, 92 S.Ct. 2125).

(Footnote omitted).

One exception to the warrant requirement is when there are exigent circumstances. *See Smock v. State*, 766 N.E.2d 401, 404 (Ind.Ct.App.2002). Exigent circumstances which justify a warrantless search have been delineated as the "risk of bodily harm or death, aiding a person in need of assistance, protecting private property, or actual or imminent destruction or removal of evidence before a search warrant may be obtained." *Sloane v. State*, 686 N.E.2d 1287, 1293 (Ind.Ct.App.1997), *trans. denied.* Specifically, as our supreme court explained in *Esquerdo v. State*, 640 N.E.2d 1023, 1027 (Ind.1994):

Exigent circumstances justifying a warrantless search exist where the police have an objective and reasonable fear that the evidence is about to be destroyed; the arresting officers must have a reasonable belief that there are people within the premises who are destroying or are about to destroy the evidence. In such cases, the evidence's nature must be evanescent and the officers must fear its imminent destruction. *The fact that narcotics are involved does*

*not, standing alone, amount to exigent circumstances justifying a warrantless search or arrest.*

(Citation omitted, emphasis added).

The State asserts, and the majority agrees, that the officers' entry into the home is justified under the exigent circumstances exception to the warrant requirement. But while exigent circumstances justify dispensing with a search warrant, they do not eliminate the need for probable cause. *Cudworth v. State,* 818 N.E.2d 133, 140 (Ind.Ct.App.2004), *trans. denied.* "In validating a warrantless search based on the existence of an emergency, as with any other situation falling within the exigent circumstances exception, the Government must demonstrate both exigency and probable cause." *Id.* (citing *United States v. Holloway,* 290 F.3d 1331, 1337 (11th Cir.2002), *cert. denied,* 537 U.S. 1161, 123 S.Ct. 966, 154 L.Ed.2d 897 (2003)). Here, just as in *Cudworth,* the State failed to demonstrate either exigent circumstances or probable cause required to support a lawful warrantless search. *See id.* at 141. The threshold and dispositive issue is whether Officers Tindall and Lawrence violated the Fourth Amendment when, after two occupants acknowledged the officers but refused to open the front door, the officers proceeded to run along the sidewalk toward the back of the house hoping that they would catch the occupants exiting the house through the back door.

It is well established that "[i]t is not unreasonable for police officers, in the pursuit of criminal investigations, to seek interviews with suspects or witnesses at their homes[.]" 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 2.3(b) at 476 (3d ed.1996) (citing *State v. Crider,* 341 A.2d 1 (Me.1975)). But it is also well established that persons have the right under the Fourth Amendment to refuse to consent to a warrantless entry of their home. *See*

*Camara v. Mun. Court of City & County of San Francisco,* 387 U.S. 523, 540, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (concluding appellant had constitutional right to insist that municipal inspectors obtain warrant before entering his home); *see also Robinson v. State,* 814 N.E.2d 704, 707 (Ind.Ct.App.2004) (acknowledging right to reasonably resist unlawful entry of police officer into person's home). Implicit in the right to refuse entry is the right to refuse to answer the door. *See, e.g., Cox v. State,* 696 N.E.2d 853, 858 (Ind.1998) ("There is no question that police are required by the federal constitution to obtain a warrant to arrest a suspect who hunkers down inside his home and refuses to leave or answer the door."). In addition, a person's assertion of that right cannot be a crime. *See Camara,* 387 U.S. at 540, 87 S.Ct. 1727 (concluding appellant could not be convicted for refusing to consent to warrantless inspection of home).

Kendall characterizes the "initial police contact" in this case as a "knock and talk." Brief of Appellant at 13. We explained knock and talk investigations in *Hayes* as follows:

A knock and talk investigation "involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house." "If successful, it allows police officers who lack probable cause to gain access to a house and conduct a search." Both federal and state appellate courts which have considered the question, including the United States Court of Appeals for the Seventh Circuit, have concluded that the knock and talk procedure does not per se violate the Fourth Amendment. "Though the 'knock and talk' procedure is not automatically violative of the Fourth Amendment, it can become so."

The constitutional analysis begins with the knock on the door. The prevailing rule is that, absent a clear expression by the owner to the contrary, police officers, in the course of their official business, are permitted to approach one's dwelling and seek permission to question an occupant.

794 N.E.2d at 496 (citations omitted).

Officers Tindall and Lawrence went to 407 North Hamilton to investigate an anonymous tip that someone was inside the house "cooking drugs." Transcript at 272. Without attempting to corroborate that tip, however, the officers went directly to that address and knocked on the door. They did so without probable cause, or even reasonable suspicion. *See Jaggers,* 687 N.E.2d at 184 (concluding anonymous tip insufficient to support issuance of warrant); *see also Washington v. State,* 740 N.E.2d 1241, 1246 (Ind.Ct.App.2000) (concluding anonymous tip insufficient to justify investigatory detention), *trans. denied.*[13] The officers' reason for going to the home and knocking on the door was legitimate, namely, to investigate an anonymous tip, but at the time they knocked on the door the officers had no constitutionally significant grounds for believing that anything illegal was going on inside the home.

After the officers knocked on the door, two occupants, at two different times, came to the front window next to the door and pulled back the curtain to see who was there. Officer Tindall testified that he shined his flashlight on his badge and said, "Police Department." Transcript at 278. After making eye contact with the officers at the front door, the occupants refused to answer and, instead, headed toward the back of the house.

To the extent that the majority questions whether the occupants' actions constituted a refusal, the evidence clearly shows that the occupants communicated to the officers that they would not open the door. Again, a person is under no obligation to answer or open his door when police have no warrant or probable cause. Here, the occupants exercised their Fourth Amendment right not to answer or open the front door. Thus, the question is whether, given the occupants' refusal, it was reasonable for the officers to run to the back of the home to see whether the occupants were leaving through the back door. It was not.

As this court explained in *Divello v. State,* 782 N.E.2d 433, 437–38 (Ind.Ct.App. 2003), *trans. denied:*

When police enter onto private property in order to conduct an investigation or for another legitimate purpose and restrict their entry to places that other visitors would be expected to go, such as walkways, driveways, or porches, any observation made from these areas is permissible under the United States Constitution and the Fourth Amendment thereto. Accordingly, an individual does not have a reasonable expectation of privacy with regard to things or activities within a residence that may be observed by persons using their natural senses from places impliedly open to a visitor's entry. *In general, this means that if police utilize normal means of access to and egress from the house for some legitimate purpose, such as to*

---

**13.** To be clear, the reasonable suspicion analysis first articulated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), does not apply to this case. Indeed, as the United States Supreme Court explained in *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), the *Terry* analysis applies to cases involving a brief encounter between a citizen and a police officer on a public street. The encounter between the officers and Kendall occurred at Kendall's private home.

*make inquiries of the occupant . . . , it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling. The implied invitation, however, extends only to those with legitimate business, and applies only to routes reasonable under the circumstances.*

\* \* \*

Under most circumstances, *uninvited visitors are . . . expected to leave by the same route after knocking on the front door and receiving no response.* Of course, the nature of the circumstances surrounding the visit can also affect the scope of the property open by implication. For example, persons previously invited to access a residence by alternate entryways, or those coming on truly pressing or emergency matters could reasonably be expected to seek out residents through areas other than the front door.

(Citations omitted, emphases added).

The officers in *Divello* knocked on the door of two residences owned by the defendant to investigate an anonymous tip of drug activity. We determined in part that after the officers received no answer at the second residence, "they should have left, as the purpose for their visit to that property terminated due to the lack of any response from any occupant. Otherwise, the well-established right of citizens to refuse to answer their door would be illusory." *Id.* at 439 (citation omitted).

The facts in this case are even more compelling than those in *Divello*. The officers here walked along the sidewalk en route to the north and back sides of the house because they thought the occupants "were going to run out the back door." Transcript at 28. But at that point, the occupants had already exercised their Fourth Amendment right not to answer the front door. Not only were the officers uninvited, but the occupants communicated to the officers that they were not welcome on the property. The State presented no evidence to show that uninvited visitors commonly used the back door to 407 North Hamilton to seek out residents. And while the officers had information that may have suggested illegal activity, that information did not rise to the level necessary to justify anything more than a visit along the most obvious and direct route to the residence. *See Trimble v. State,* 816 N.E.2d 83, 90 (Ind.Ct.App.2004). Simply put, once the police had encountered the occupants and were turned away, they should have left the premises by the same route upon which they had arrived.

As this court warned in *Hayes,* 794 N.E.2d at 497, while a "knock and talk" procedure is not per se unlawful, it " 'pushes the envelope' and can easily be misused." We further stated in *Hayes,* "[k]nock and talk might more aptly be named ' "knock and enter," ' because it is usually the officer's goal not to merely talk but to conduct a warrantless search of the premises." *Id.* Again, while the "knock and talk" procedure is not necessarily unlawful, it is a dangerous short-cut around the bedrock requirement that police have probable cause to enter a home.

The officers in this case, however, were able to complete only one half of the "knock and talk" procedure, namely, they knocked, but the occupants refused to talk. And the officers had not observed anything that corroborated the anonymous tip between the time they knocked on the door and when the occupants twice looked at them through the front window. Rather, the officers merely heard the two occupants, and saw their silhouettes, move toward the back of the house. And because this was an encounter between police and

the occupants at a private home, the fact that the occupants were moving about inside the house did not justify the officers' continued pursuit. *Cf. Wardlow,* 528 U.S. at 124–25, 120 S.Ct. 673 (holding officer had reasonable suspicion to perform investigatory stop of person in high crime area who ran away upon seeing law enforcement approach).

Further, the officers' concern that the occupants "were going to run out the back door" did not amount to probable cause or exigent circumstances that would justify pursuit of the occupants while still inside their home. Transcript at 28. Indeed, the State's argument in this regard is understandably weak. The State's entire argument regarding the reasonableness of the officers' actions is as follows:

> Officer Tindall ran to the rear of the house, hoping to intercept anybody fleeing out the back, which was a reasonable response under the circumstances. *See* [*Sayre v. State,* 471 N.E.2d 708, 713 (Ind.Ct.App.1984)] (noting that in so-called "open-view" cases where contraband is observed by an officer, in determining whether the officer has entered constitutionally protected space, "the question is not whether a trespass has occurred but whether the police officer's actions were reasonable under the circumstances").

Brief of Appellee at 11–12. But the occupants were free to leave their home by the back door. And even if they had exited, the officers could not have detained them because an anonymous tip is insufficient to justify an investigative detention. *See Washington,* 740 N.E.2d at 1246.

Finally, this is not a case in which the officers knocked on the door, received no response, and then decided to try the back door hoping to make contact with someone inside the house. My research has revealed cases involving such factual scenarios. *See, e.g., United States v. Anderson,* 552 F.2d 1296, 1300 (8th Cir.1977) (concluding federal agents' actions of walking to back yard were reasonable where their knock at front door went unanswered and agents saw a light on inside house and heard dog barking); *United States v. Bradshaw,* 490 F.2d 1097, 1100 (4th Cir. 1974) (concluding officer acted reasonably when he walked around to back door after receiving no response at front door when officer had reason to believe suspect was home), *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); *State v. Seagull,* 95 Wash.2d 898, 632 P.2d 44, 48–49 (1981) (concluding officer acted reasonably when he first knocked at one door, and then after remembering from previous visit that former occupants could not hear knock at that door, walked to another door). Here, after Officer Tindall knocked on the front door, two occupants came to the front window but did not open the door. As a result, the officers knew people were inside. Unlike in the cases cited above, there was no need for the officers in this case to go to the back door to ascertain whether someone was at home.

In sum, I agree with the *Hardister* panel that after the occupants refused to answer the door, the officers were no longer on the property for legitimate business. *See Hardister,* 821 N.E.2d at 920; *Divello,* 782 N.E.2d at 439. Also at that point, any implied invitation the officers may have had to use the sidewalks or other common areas was extinguished. *See Divello,* 782 N.E.2d at 437. Therefore, after the occupants exercised their right to refuse to answer the door in response to Officer Tindall's knocks, the officers had no further legitimate business on the premises and were required to leave by the same route by which they entered onto the property. *See Hardister,* 821 N.E.2d at 920; *Divello,* 782 N.E.2d at 438.

As noted above, our supreme court has stated that "[t]he fact that narcotics are involved does not, standing alone, amount to exigent circumstances justifying a warrantless search or arrest." *Esquerdo*, 640 N.E.2d at 1027. The critical and controlling fact here is that the officers had no more than an uncorroborated anonymous tip that drug activity was occurring inside the home. And the fact that the officers heard and observed the occupants who had looked through the front window move toward the back of the house after they refused to open the door did not, in itself, justify the officers' continued presence on the property. When the officers ran along the sidewalk to pursue the persons who had lawfully refused to answer the door, the officers entered constitutionally protected space without probable cause or reasonable suspicion, and in so doing violated the Fourth Amendment. This conclusion is consistent with the most basic purpose of the Fourth Amendment, namely, to secure the right of persons to be left alone in the privacy of their own homes. *See California v. Ciraolo*, 476 U.S. 207, 226, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (Powell, J., dissenting).[14]

Further, the Fourth Amendment violation in this case, and the admission of the evidence seized subsequent to that violation, is not harmless. Admissions of evidence in violation of the Fourth Amendment are subject to harmless error analysis. *Smock*, 766 N.E.2d at 407. Harmless error occurs when the conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no likelihood that the erroneously admitted evidence contributed to the conviction. *Id.* Violations of the Fourth Amendment must be harmless beyond a reasonable doubt. *Id.* We must find that there is no substantial likelihood the error contributed to the verdict, or, in other words, that the error was unimportant in relation to everything else before the jury on the issue in question. *Id.*

Here, Kendall asserts that not only must the officers' testimony regarding what they saw through the side and back windows of the home be suppressed, but all evidence later recovered from the home must also be suppressed, even though the police eventually obtained a search warrant. I agree. As this court explained in *Sanchez v. State*, 803 N.E.2d 215, 221 (Ind. Ct.App.2004), *trans. denied*:

> [E]vidence obtained pursuant to an unlawful search or seizure has to be excluded under the fruit of the poisonous tree doctrine. "When applied, the 'fruit of the poisonous tree' doctrine operates to bar not only evidence directly obtained, but also evidence derivatively gained as a result of information learned or leads obtained during the unlawful search or seizure." Nonetheless, the United States Supreme Court has refused to adopt a "but for" rule, making inadmissible any and all evidence which

---

14. Fourth Amendment issues are inherently fact-sensitive. Indeed, there may be circumstances in which an officer's decision to further investigate an anonymous tip may be reasonable. For example, recently this same panel decided *Collins v. State*, 822 N.E.2d 214 (Ind.Ct.App. Feb.9, 2005), *trans. pending*, which involved an anonymous tip that someone inside the residence had been shot. Although the defendant in that case did not challenge the officers' actions of walking along the side of the house, nor did he assert that there was a refusal to answer the door, it was reasonable, given the nature of the anonymous tip, for the police in that case to investigate further. But where, as here, the anonymous tip concerns drug activity inside a home, and the occupants exercise their constitutional right not to answer the door, the officers may not thereafter remain on the property in an attempt to talk with the occupants. *See Divello*, 782 N.E.2d at 439.

comes to light through a chain of events beginning with an illegal stop or arrest. Rather, the Court stated, "the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Evidence may be purged of the primary taint if the causal connection between the illegal police conduct and the procurement of the evidence is "so attenuated as to dissipate the taint of the illegal action."

(Citations omitted).

In this case, the evidence recovered from the home pursuant to the search warrant has a causal relationship to the initial illegal police activity. Indeed, had the officers not run along the sidewalk in pursuit of the occupants who, according to Officer Tindall, may have planned to exit out the back door, Officer Tindall would not have seen Hardister pouring cocaine down the drain. It was that observation that, ultimately, provided both the exigent circumstances and probable cause to enter the home without a warrant. And the officers did not obtain a search warrant until after they had entered the home and secured the occupants.

Still, the State maintains that because Kendall exited the house through the second-story window and threw what appeared to be two bags of cocaine, he abandoned that property. Kendall responds that the State's abandonment argument must fail because the initial police action caused the abandonment. Again, I agree with Kendall. Abandoned property is not subject to Fourth Amendment protection. *Swanson v. State*, 730 N.E.2d 205, 210 (Ind.Ct.App.2000). However, if the decision to discard property was caused by

improper police conduct, the abandonment is not considered truly voluntary, and the evidence is not admissible. *See id.* The testimony during the hearing on Kendall's motion to suppress shows that back-up officers observed Kendall and his two brothers exiting the second-story window *after* Officers Tindall and Lawrence ran to the side and back of the house. Officer Tindall explained that after he saw Hardister dumping what appeared to be cocaine down the sink, he ran back toward the front of the house and heard other officers yelling at persons on the roof. Based on that evidence, Kendall's decision to exit out the second-story window and throw the bags of cocaine was caused by the initial, unlawful police action and, therefore, such evidence was inadmissible.

In sum, all of the evidence the State presented to secure Kendall's convictions, from Officer Tindall's testimony regarding what he observed through the back window to the cocaine, guns, and money recovered from the home, should have been excluded as fruit of the poisonous tree. Without that evidence, the State presented little if no evidence to support Kendall's convictions, and, therefore, the error in the admission of evidence obtained in violation of the Fourth Amendment was not harmless beyond a reasonable doubt. *See Smock*, 766 N.E.2d at 407. Accordingly, I would reverse and order the trial court to vacate Kendall's convictions.

### Double Jeopardy

I agree with the State that Kendall's convictions for possession of cocaine and a firearm and possession with intent to deliver violate neither the statutory elements test nor the actual evidence test under the Indiana Constitution. "[T]wo or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes *or*

the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State,* 717 N.E.2d 32, 49 (Ind.1999). Under the statutory elements test, each offense must contain at least one element that is separate and distinct from the other offense so that the same evidence is not necessary to convict for both offenses. *Id.* at 52. The actual evidence test, however, "prohibits multiple convictions if there is 'a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.'" *Davis v. State,* 770 N.E.2d 319, 323 (Ind.2002) (citing *Richardson,* 717 N.E.2d at 53). For convictions to violate the actual evidence test, the defendant must show that the evidentiary facts establishing the elements of one offense also establish all of the elements of the second offense. *See Spivey v. State,* 761 N.E.2d 831, 833 (Ind.2002). Thus, even if "each charge utilizes the same factual event," no constitutional violation will be found if the second offense "requires additional evidentiary facts establishing the essential elements." *Davis,* 770 N.E.2d at 324.

Kendall's convictions for dealing in cocaine and possession of cocaine and a firearm do not violate the statutory elements test because each crime contains an element of proof the other does not. The dealing charge required proof of Kendall's possession of three or more grams of cocaine with the intent to deliver, *see* Ind.

Code § 35–48–4–1(a)(1)(C) and (b)(1), and the possession of cocaine and a firearm charge required proof that he possessed a firearm. *See* Ind.Code § 35–48–4–6(b)(1)(B).

Regarding the actual evidence test, even if the jury used the same cocaine to convict Kendall of dealing and possession of cocaine and a firearm, no constitutional violation occurred. Our supreme court has made clear that "the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of a one offense also establish only one or even several, but not all, of the essential elements of a second offense." *Spivey,* 761 N.E.2d at 833. The evidence that Kendall possessed cocaine establishes only one, but not all, of the essential elements of possession of cocaine and a firearm.[15]

The majority is correct that "[e]ven where no constitutional violation has occurred, multiple convictions may nevertheless violate the 'rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in [*Richardson v. State,* 717 N.E.2d 32 (Ind.1999)].'" *Vandergriff v. State,* 812 N.E.2d 1084, 1088 (Ind.Ct.App.2004), *trans. denied.* These rules fall under broader categories set forth by Justice Sullivan in his concurring opinion in *Richardson* and include the following: (1) "Conviction and punishment for a crime which is a lesser-included offense of another crime for which the defendant has been convicted and punished"; (2) "Conviction

---

**15.** Since *Spivey,* this court has determined that "the *Richardson* actual evidence test, as applied by our [s]upreme [c]ourt, has found double jeopardy to be violated where the evidentiary fact(s) establishing one or more elements of one challenged offense establish all of the elements of the second challenged offense." *Alexander v. State,* 772 N.E.2d 476, 478 (Ind.Ct.App.2002), *trans. denied.* But Kendall's convictions for possession of cocaine and a firearm and dealing do not violate that articulation of the actual evidence test either. Again, the evidence that Kendall possessed cocaine proves only one of the two essential elements of possession of cocaine and a firearm.

and punishment for a crime which consists of the very same act as another crime for which the defendant has been convicted and punished"; (3) "Conviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished"; (4) "Conviction and punishment for an enhancement of a crime where the enhancement is imposed for the very same behavior or harm as another crime for which the defendant has been convicted and punished"; and (5) "Conviction and punishment for the crime of conspiracy where the overt act that constitutes an element of the conspiracy charge is the very same act as another crime for which the defendant has been convicted and punished." *Id.* (citing *Richardson,* 717 N.E.2d at 55–56 (Sullivan, J., concurring)).

These categories were applied by a majority of our supreme court in *Guyton v. State,* 771 N.E.2d 1141, 1143 (Ind.2002), to determine if a defendant's convictions for murder and carrying a handgun without a license violated double jeopardy principles. In reciting the five categories, the majority in *Guyton* noted that only one, lesser-included offenses, "presumably covered ... constitutional Double Jeopardy," thereby implying that the remaining categories addressed common law violations. *Id.* In addition, in his concurring opinion, Justice Boehm explained in relevant part: "The first Sullivan rule is the statutory elements test, identical to federal double jeopardy under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)." *Id.* at 1149–50 (Boehm, J., concurring); *see also Richardson,* 717 N.E.2d at 50 n. 41 (stating statutory elements test is similar to *Blockburger* "same elements" test). Thus, contrary to the majority's suggestion, Justice Sullivan's first category, namely, conviction and punishment for a crime which is a lesser-

included offense of another crime, is a constitutional double jeopardy violation, not a common law violation. Additionally, the analysis applied to determine whether one crime is a lesser-included offense of another is identical to the statutory elements test under Article I, Section 13 and similar to the same elements test under *Blockburger. See id.*

Indiana Code Section 35–38–1–6 establishes that a trial court may not enter judgment of conviction and sentence a defendant on both a greater and lesser-included offense. An offense may either be inherently included or factually included. *Carroll v. State,* 740 N.E.2d 1225, 1231 (Ind.Ct.App.2000), *trans. denied.* An offense is inherently included in another offense if the lesser offense may be established "by proof of the same material elements or less than all the material elements" defining the "greater" offense charged. *Id.* at 1232 (citation omitted). An offense is factually included in another offense when the charging information alleges the "means used to commit the crime charged include all of the elements of the alleged lesser included offense." *Id.* (citation omitted).

As the majority acknowledges, it is well settled that the possession of cocaine is a lesser-included offense of possession of cocaine with intent to deliver when the same cocaine is used to prove both crimes. *See Reynolds/Herr v. State,* 582 N.E.2d 833, 839 (Ind.Ct.App.1991) (stating where evidence shows only one possession of cocaine by defendant, which is material element of dealing, defendant cannot be convicted of both possession and dealing). But, again, not all of the elements of possession of cocaine and a firearm are included within the crime of possession with intent to deliver, and contrary to the majority's suggestion, possession of cocaine and a firearm, unlike possession of co-

caine, is neither a factually nor inherently included offense of possession with intent to deliver.

The majority's analysis suggests that the possession of a firearm element under Indiana Code Section 35–48–4–6(b)(1)(B) is not an "essential element" of the crime of possession of cocaine and a firearm. I disagree. Although the crimes listed under Indiana Code Section 35–48–4–6(b) may be variations on what the majority refers to as the "base" offense of possession of cocaine, op. at 454, each is a separate crime with distinct elements of proof. In other words, even though the factors listed under Indiana Code Section 35–48–4–6(b) enhance Class D felony possession of cocaine to a Class C, B, or A felony, those factors, i.e., possession of three or more grams of cocaine, possession of a firearm, or possession within one thousand feet of a school or park, are all statutory elements that the State must prove to obtain a conviction.[16] Thus, the existence of the firearm element matters for purposes of any double jeopardy analysis. *See, e.g., Whitt v. State,* 659 N.E.2d 512, 514 (Ind.1995) (concluding convictions for possession of cocaine within one thousand feet of school property and failing to pay controlled substance excise tax ("CSET") did not violate federal double jeopardy because to convict defendant of first offense, State had to prove possession *within one thousand feet of school property* and to convict of second offense, State had to prove possession without having paid the CSET);[17] *see also Davis,* 770 N.E.2d at 324 (explaining even if each charge utilizes same factual event, no constitutional violation occurs if second offense requires additional facts establishing essential elements).

Finally, I acknowledge that I authored the opinion in *Jones v. State,* 807 N.E.2d 58, 67 (Ind.Ct.App.2004), a decision on which the majority relies. But in *Jones,* the State conceded the double jeopardy violation, and the issue presented on appeal was the appropriate remedy on remand. Thus, *Jones* does not control the issue here, namely, whether the statutory requirement that the State prove possession of a firearm to convict a defendant under Indiana Code Section 35–48–4–6(b)(1)(B) may be ignored for double jeopardy purposes. In sum, I would conclude that Kendall's convictions for possession of cocaine and a firearm and possession with intent to deliver do not violate double jeopardy under Indiana law.

---

**16.** The issue in this case is whether possession of cocaine and a firearm is a lesser-included offense of possession of cocaine with intent to deliver. There may be situations in which convictions for both of those crimes violate the actual evidence test. Further, there may be cases in which dual convictions for possession of cocaine within one thousand feet of school property, for example, and possession of cocaine with intent to deliver violate the actual evidence test. Again, I only conclude today that possession of cocaine and a firearm is not a lesser-included offense of possession of cocaine with intent to deliver.

Nor do those two convictions violate the actual evidence test in this case.

**17.** Even though *Whitt* involved federal double jeopardy, our courts have recognized that Indiana's statutory elements test is essentially the same as the federal test set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See Richardson,* 717 N.E.2d at 50 n. 41 (stating Indiana's statutory elements test is analogous to *Blockburger* "same elements" test). The point is that under federal or state double jeopardy law, the element that Kendall possess a firearm is significant.